JOHN GRANT v. DULUTH, MISSABE & NORTHERN RAILWAY COMPANY.[1]

November 27, 1896.

Nos. 10,204—(109).

**Corporation—Contract—Authority of President.**
*Held*, that neither the articles of association nor the by-laws of the defendant gave its president any authority to make on its behalf the contract upon which plaintiff seeks to recover.

**Same—Apparent Authority.**
Also, that, the board of directors never having given him any actual authority to make the contract, there was no evidence that they had, by custom or acquiescence in such a course of business, clothed him with any apparent authority to make it.

**Same—Ratification.**
Also, that there was no evidence from which a subsequent ratification or adoption of the contract could be inferred.

Appeal by plaintiff from an order of the district court for St. Louis county, Morris, J., denying a motion for a new trial. Affirmed.

*Clapp & Macartney*, for appellant.

*Cotton, Dibell & Reynolds* and *Geo. Welwood Murray*, for respondent.

[1] Reported in 69 N. W. 23.

MITCHELL, J. The defendant corporation was organized to construct, equip, and maintain a railroad. By its articles of association, the government of the corporation and the management of its affairs were vested in a board of nine directors. Among the officers provided for was a president, to be elected by the board of directors. The articles also provided for the appointment by the board of an executive committee, to consist of the president and two directors, which should be vested with such powers as the board of directors might from time to time determine, prescribe, or limit. The articles of association are otherwise silent as to the powers of the president. The by-laws, after providing that the board of directors "is authorized to exercise in the government and management of said company an unrestricted authority and to exercise therefor the entire corporate authority of the company," further provide that the president "shall be the executive officer of the company and shall have the supervision of its affairs, with full power to execute all resolutions and orders of the board of directors not specially intrusted to some other officer of the company; * * * he shall sign in the name of the company all certificates of stock, bonds, obligations, contracts, and other instruments made in behalf of the company, unless in special cases it is ordered otherwise by the board of directors."

It is alleged in the complaint, and admitted in the answer, that prior to May 1, 1893, the defendant, having theretofore, by resolution of its board of directors, resolved upon the construction of what is known as its "Superior Branch," entered into a contract with the firm of Wolf & King for the construction of such branch, by the terms of which Wolf & King were to construct it on or before August 1, 1893, and the defendant was to pay them for the work upon monthly estimates; that on May 6 and June 3, 1893, Wolf & King and this plaintiff entered into contracts by the terms of which plaintiff was to do the grading on certain parts of this Superior Branch, for which Wolf & King were to pay him in monthly payments, according to the engineer's estimates, the work to be completed by plaintiff by August 1, 1893. In short, Wolf & King sublet to plaintiff part of the work included in their contract with defendant, the times of payment and for the completion of the work being fixed to correspond approximately with the terms of the contract between Wolf & King and the defendant.

It appears from the evidence that subsequently, by agreement between Wolf & King and the defendant, the time for the performance of the contract of the former was extended to November 1, 1893, and that, by a like agreement between plaintiff and Wolf & King, the time for the performance of plaintiff's subcontract was also extended to the same date. Although we do not deem the fact material, yet it may be also stated that it appears that the defendant was especially interested in having the construction of this road completed by November 1, 1893, for the reason that its right to certain bonds voted by St. Louis county in aid of the road was dependent on its being completed by that date.

There was evidence tending to prove that in the summer, and while the work of construction under these contracts was in progress, the defendant defaulted in making its monthly payments to Wolf & King, as required by its contract, and that, in consequence thereof, Wolf & King also defaulted in making their monthly payments to plaintiff, as provided in their contract with him, and that, on account of such default, plaintiff had in contemplation stopping work under his contract; that, in this condition of things, Wolf & King and plaintiff went to see Alfred Merritt, the president of the defendant company, and informed him of the situation, and especially of plaintiff's determination to quit work in consequence of the default in the payments. We will here let plaintiff state in his own words the promise then made by Merritt, and upon which he now seeks to hold the defendant liable:

"He acknowledged it there in my presence that he would see I was made good for any loss we might sustain if we continued on and completed the work before the 1st of November, as they had some county bonds voted. The payment of those bonds depended on whether the work was completed by the 1st of November or not, and, if we went on and completed that work before the 1st of November, he would see we were paid all the loss we might sustain in consequence of the work, or default of money, rather."

And, again:

"Mr. Merritt told me to go on and complete that work, have it completed by the 1st of November, and he would see that I was paid for any loss that I might sustain in doing that."

The evidence tends to show that thereupon and thereafter plaintiff continued the work of grading covered by his contract with Wolf & King, and completed it prior to November 1; that defendant paid

Wolf & King according to its contract with them, and Wolf & King, in turn, paid plaintiff the amount fixed by their subcontract with him; and that on December 29, 1893, he received and accepted from Wolf & King a sum of money in full payment and discharge of all sums owing by them to him for grading done on the Superior Branch of defendant's road, and in full payment and discharge of any and all claims arising or growing out of such work due or to become due thereon.    There is also evidence tending to show that the work in fact cost plaintiff over $16,000 more than the price agreed on in the contract between him and Wolf & King.    It is this amount which plaintiff seeks to recover, his contention being that Merritt's promise was made in behalf of the defendant, and not of himself individually, and his construction of that promise is that, if he (plaintiff) would go on and complete the work covered by his contract with Wolf & King, the defendant would make good to him the difference between what the work cost him and what he was to receive for it from Wolf & King.

Conceding, without deciding, that plaintiff is correct in both of these contentions, yet the trial court was clearly right in directing a verdict for the defendant at the close of the evidence, for the reason that there was no evidence that the president of the company had any authority to make such a contract for the corporation, or that the corporation ever ratified it.

Counsel for plaintiff correctly conceded on the argument that neither the articles of association nor the by-laws of the company conferred any such power on its president; also, that the board of directors never vested any such authority in him by any resolution or other express act. · Neither was there any evidence that they had, by acquiescence in such a course of dealing, invested him with any apparent authority to make such a contract in behalf of the company.    As presidents of corporations very frequently exercise, with the knowledge and tacit acquiescence of the directors, wider powers than those given them by the articles and by-laws of the corporation, courts, recognizing this fact, have usually adopted a very liberal rule in favor of persons contracting with such officers, whenever there was evidence reasonably tending to show that it had been the custom, and hence with the presumed acquiescence of the directors, for the president or other officer to exercise such powers.    They have also, in view of such custom, adopted a somewhat liberal rule in determining

what are the implied powers of a president, by virtue of his office, under the articles and by-laws of the association.     But it would not be claimed that authority to make such a contract as this in behalf of the defendant was within the implied powers of the president, merely as an executive officer, especially in view of the explicit provisions of the articles of association vesting the entire government of the corporation and the management of its affairs in the board of directors.

And, as already suggested, there is no evidence that the board of directors had, by custom or acquiescence, ever clothed the president with any apparent authority to make such contracts.     The only particle of evidence upon which counsel seizes as tending to support any such contention is the bare fact that the secretary of the company testified on cross-examination that the records of the company between April 24, 1893, and October 17, 1893, "are silent as to any action in reference to the building of the Superior Branch of this road."     The inference which he seeks to draw from this is that the contract in behalf of the company with Wolf & King was entered into without any prior authorization of the board of directors.     In view of the allegations in plaintiff's complaint already referred to, upon which there was no issue, it seems evident to us that the inference sought to be drawn from the testimony of the secretary is wholly unwarranted.     When we examine the record for evidence of subsequent ratification of the act of the president by the board of directors, we find it entirely wanting.     There is not a particle of evidence that any one of the nine directors, except Merritt himself, ever knew that he had assumed to make any such contract in behalf of the company until plaintiff presented his claim, in February, 1894, when they promptly rejected it.     There is no evidence that any minute or memorandum of this alleged agreement was anywhere made in the books or records of the company from which notice to the directors might be inferred or presumed.

As a last resort, counsel falls back upon the proposition that, if a principal knowingly accepts and retains the benefits of a prior unauthorized contract made in his behalf, this amounts to a ratification. Rightly applied, this rule is correct, but it has no application to the facts.     Counsel's claim is that the case is within the rule, because the defendant has accepted the constructed road, and has thereby accepted and retained the benefits of plaintiff's work.     The defendant had let

66 M.—23

a contract to Wolf & King for the entire construction of this road. It had, so far as the directors knew, no contractual relation with plaintiff. The work of construction continued, so far as appears, after the making of the alleged contract between Merritt and plaintiff, precisely as it had before; the defendant dealing wholly with Wolf & King, and the plaintiff dealing wholly with the latter, just as any subcontractor would. We are unable to conceive how the acts of the defendant in accepting the completed road, and settling with Wolf & King, in ignorance, so far as appears, of Merritt's promise to plaintiff, can be construed as an implied ratification of Merritt's act. What the company accepted and retained was the fruits of the contract with Wolf & King, and nothing else.

Order affirmed.