NEVADA NICKEL SYNDICATE, Limited, v. NATIONAL NICKEL CO. et al.

(Circuit Court, D. Nevada.   August 7, 1899.)

No. 641.

**1. PRINCIPAL AND AGENT—AGENCY FOR TWO PRINCIPALS—AGREEMENT FOR DISCRETIONARY POWERS.**
   Where the parties to a contract agree upon an agent, who is given discretionary power in carrying out the contract on the part of one party, he becomes the agent of both, and his acts within the scope of his agency are binding upon both.

**2. CORPORATIONS—INFORMAL EXECUTION OF MORTGAGE—ESTOPPEL.**
   A corporation may be estopped to question the validity of a mortgage duly executed by its officers over its corporate seal, though not authorized by any action of its directors, where they individually knew and approved of its execution, but, by reason of the absence of some of their number, a meeting could not be held to take formal action thereon.

**3. SAME.**
   A contract between two corporations, duly authorized by their boards of directors, gave the first corporation a lien on property of the second for advances made, and further provided that the second should execute such other deeds or documents as might be required or deemed necessary by the legal advisers of the first to perfect the security under the local laws where the property was situated.   Such advisers required the giving of a

mortgage, which was then duly executed by the officers of the second corporation, with the knowledge and approval of its directors, who agreed to ratify such action, though it was impossible at that time for a meeting to be held to take formal action thereon. In a similar manner a further agreement was made for an increase in the amount to be advanced. In reliance upon such action the first corporation accepted the mortgage and made the advances. *Held*, it appearing that both parties acted in good faith, that the directors of the second corporation were bound in equity to ratify the action taken, and the corporation was estopped to deny the validity of the mortgage.

4. CONTRACT—PARTIAL ENFORCEMENT—UNCONSCIONABLE PROVISIONS.

A corporation entered into a contract with a second corporation, which owned mines, and had secured a contract for the sale of a certain quantity of the mineral therefrom, but was without works to reduce the ore, by which it agreed to advance the money to purchase machinery and erect the necessary works, and to produce the quantity of mineral required to fill the order, for which it was to be repaid the sum advanced, together with a bonus of 200 per cent.; the same to be a charge on the property and product of the second party until paid. The money was to be expended entirely under the direction of the first corporation, and the work to be in charge of its agent, who was agreed upon and named in the contract. An amount of money equal to that limited in the contract was advanced, and reduction works were built; but they failed to operate successfully, and the undertaking was abandoned. *Held* that, in the absence of any usury law affecting the contract, it was legal, and the lien given thereunder would be enforced by a court of equity to the extent of the amount of money advanced in good faith, and expended under the direction of an agent selected by both parties, with interest, without regard to the cause of failure, but that, as the second corporation received no benefit from the contract, the principal inducement for which was the production of the mineral which it had sold, it would be unconscionable to compel the payment of the stipulated bonus when such mineral was not produced.

This suit was brought by complainant to recover from the defendant the National Nickel Company the sum of $85,512.33, and to foreclose a mortgage lien for said amount upon certain mining property and premises owned by said defendant, situate in Churchill county, Nev. The complainant is a corporation organized under the laws of Great Britain. The defendant the National Nickel Company is a corporation organized and existing under and by virtue of the laws of the state of Illinois.

The original bill was filed July 20, 1897. Frederick B. Pierce, Milo T. Sipe, R. Peterman, and Louis Smith were made parties defendant on the ground that they had, or claimed to have, some interest in the property, which, it was alleged, was subsequent to, and subject to, the claim of the complainant. An amended bill was filed September 6, 1897, to which Charles Bell was added as a party defendant. The supplemental bill was, by leave of the court, filed October 25, 1897. Charles E. Brooks was made a party defendant thereto. The supplemental bill prayed for relief against two judgments obtained by default against complainant in the state district court for Ormsby county, Nev.,— one by the National Nickel Company for $26,080 damages for breach of the contracts A and C; the other in favor of Charles E. Brooks, a stockholder in the National Nickel Company, to set aside and cancel Exhibit B. Both of these judgments, after the filing of the supplemental bill herein, were set aside by the state courts, and hence are eliminated from this suit, except in so far as they may tend to sustain complainant's allegations of fraud against the defendant corporation. An answer of the National Nickel Company to the amended bill was filed September 29, 1897, and to the supplemental bill on April 5, 1898. A separate answer of Louis Smith was filed October 14, 1897, and a separate answer of Charles E. Brooks to the supplemental bill was filed April 5, 1898.

The complainant's right to recover herein rests upon the construction which is to be given to certain contracts and instruments of writing executed by the respective corporations, and upon the testimony of witnesses as to whether the covenants in said contracts and instruments, to be performed by complainant, have been performed in such a manner as to be binding upon the defendant corporation. These contracts are hereby designated as Exhibits A, B, and C.

Exhibit A reads as follows:

"Articles of agreement made the fifteenth day of October, one thousand eight hundred and ninety-four, between the Nevada Nickel Syndicate, Limited, whose registered office is situate at 40 Great Tower street, in the city of London (hereinafter called the 'syndicate'), of the first part; the National Nickel Company, a company formed under the laws of the state of Illinois (hereinafter called the 'company'), of the second part; and John Leighton, of 7 Nottingham place, Marylebone road, in the county of London, gentleman, of the third part: Whereas, the company are the owners of the nickel mines, particulars of which are mentioned and set forth in the schedule hereto; and whereas, they are desirous of erecting plant for the purpose of working the said mines; and whereas, Mess. Thomas Bolton & Sons, of Oakamoor Mills, near Cheadle, North Staffordshire, have agreed to purchase from the company one hundred and twenty-five tons contained nickel in matte, at a price which will amount to ten thousand five hundred pounds, or thereabouts; and whereas, the company have applied to the syndicate to provide such a sum as may be necessary for the erection and preliminary working of the machinery necessary to manufacture and ship a limited quantity, not exceeding the amount of matte required to provide for the order above mentioned, which the syndicate agree to do upon the terms hereinafter mentioned:   Now, it is hereby agreed as follows:   (1) The company will forthwith instruct Frederick William Martino, of Sheffield, or, in the event of his declining or being unable to act, some other person of equal position, to be approved by the syndicate, to proceed to Nevada for the purpose of purchasing and erecting the machinery necessary for the purpose above mentioned, and will arrange with the said Frederick William Martino, or such other expert as aforesaid, to superintend the purchase, erection, and preliminary working of such machinery as aforesaid.   (2) The syndicate will from time to time provide the moneys necessary to pay for such machinery as may be deemed necessary by the said Frederick William Martino for the purpose aforesaid, and for the traveling expenses of the said Frederick William Martino, not exceeding two hundred pounds, and for the salary of the said Frederick William Martino, and for the wages of the men required for the erection and preliminary working of the said machinery, but so that the aggregate amount to be provided under this clause, including the costs and expenses connected with the negotiations for and completion of these presents, and the formation and registration of the syndicate, and all costs, charges, and expenses to which the syndicate may be put in connection with the business, the subject of this agreement, and also including the traveling expenses of a representative of the company, not exceeding two hundred pounds, and those of a representative of the syndicate, who is to proceed to Nevada as hereinafter mentioned, and which are agreed at the sum of two hundred pounds, shall not exceed four thousand pounds.   (3) The company hereby agree, for the considerations aforesaid, to pay to the syndicate a sum equal to the aggregate amount provided by them under clause 2 of this agreement, together with a bonus of eight hundred pounds, within ten days after bills of lading for a sufficient portion of the said one hundred and twenty-five tons of contained nickel to produce the said aggregate amount, and the eight hundred pounds, after providing for discount, first arrive in England, but so that under no circumstances shall payment of the said amount be delayed beyond the first day of August, one thousand eight hundred and ninety-five.   (4) The company further agree to pay the syndicate a further bonus of seven thousand two hundred pounds in manner following:   That is to say, the sum of eight hundred pounds on the first day of November, one thousand eight hundred and ninety-five, and the sum of one thousand six hundred pounds on the first day of November in each of the four following years.   (5) The syndicate shall be entitled to send a representative to the said mines, who shall have the disbursement of all moneys in connection with the said works, and have general superintendence of the

works. (6) For the purpose of securing the payment of the moneys payable by the company to the syndicate as provided in clause 3 hereof, the company hereby transfers to the syndicate absolutely all ore at present mined, or which may during the continuance of the security be mined, by the company, and all plant, machinery, and other assets of the company for the time being at the said mines; and they agree forthwith to give possession to the syndicate of such ore so mined as aforesaid, and such plant, machinery, and assets, and, further, that such possession shall be given to the representative of the syndicate by the representative of the company who is to proceed forthwith to Nevada, to the end that the absolute control of the said mines and all other assets of the said company on the said mines shall be and remain in the custody of the syndicate, by way of security to them for the repayment to them of the moneys payable under clause 3 as aforesaid. (7) By way of further security for the payment of the said moneys payable by the company under clause 3 as aforesaid, the company hereby charge with the payment thereof the contract of the company with the said T. Bolton & Sons for the purchase of the said one hundred and twenty-five tons contained nickel, and the proceeds of sale thereof. And these presents shall be a sufficient authority to the said T. Bolton & Sons to pay the proceeds of sale of the said contained nickel in matte in cash to the syndicate, and the receipt of the syndicate, or of any officer duly authorized by them, shall be a sufficient discharge to the said T. Bolton & Sons for all moneys payable in respect of the said one hundred and twenty-five tons of contained nickel. (8) By way of security for payment of the sums which will become payable in the year one thousand eight hundred and ninety-five, and each of the four subsequent years, by the company, under clause 4 of these presents, the company hereby charge the first products of the mines during each of such years, respectively, with the payment of the amount payable in such year, except that as regards the year one thousand eight hundred and ninety-five the charge shall only operate after the said one hundred and twenty-five tons of contained nickel has been produced. (9) The company hereby guaranties that it has not and will not issue any debentures which can in any way take priority over the charges hereby created, and it is expressly stipulated that the syndicate shall not be bound to make any advances other than the necessary cost of traveling expenses and current salary of Mr. Martino, unless and until the syndicate shall be satisfied, by an examination of the registers necessary under the law of Nevada, that no such charges exist; and, in the event of any such charges being discovered, the company hereby agree forthwith to repay all moneys then advanced by the syndicate, together with all expenses and costs as hereinbefore mentioned, and together with interest thereon at five per cent. per annum. (10) The above agreement has been entered into by the syndicate at the request of the said John Leighton, who is largely interested in the company; and the said John Leighton, in consideration thereof, hereby guaranties the due payment of the moneys payable by the company under clause 3 of these presents, and, further, that the company shall and will make, do, execute, and perfect all such deeds and documents, and make and complete all registrations necessary to give the syndicate a valid and effectual charge on the products of the mines, as provided by clause eight of these presents, and as may be required or deemed necessary by the legal advisers of the syndicate in Nevada for perfecting this security according to the laws there in force.

"In witness whereof, the Nevada Nickel Syndicate, Limited, have caused their common seal to be hereunto affixed, * * * and these presents to be signed by its president and assistant secretary, the day and year first above written.                                    John Leighton, President.

"[Corporate Seal.]                           S. F. Field, Assistant Secretary.
                                             "John Leighton."

(This agreement was properly witnessed, stamped, and duly acknowledged.)

Exhibit B:

"This indenture, made this thirty-first day of December, in the year one thousand eight hundred and ninety-four (1894), between the National Nickel Company, a corporation duly organized and existing under the laws of the state of Illinois, party of the first part, and the Nevada Nickel Syndicate,

Limited, of the city of London, England, a corporation, party of the second part, witnesseth, that the party of the first part, for and in consideration of the sum of ten dollars, gold coin of the United States of America, to it in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, does by these presents grant, bargain, sell, remise, release, and forever quitclaim unto the party of the second part, and to its successors and assigns, the following nickel mines and mining claims situate in the Table Mountain mining district, Churchill county, state of Nevada, to wit: First, the claim known as the 'London'; second, the claim known as the 'Liverpool'; third, the claim known as the 'Royal George'; fourth, the claim known as the 'Ætna'; fifth, the mining ground situated at the junction of Cottonwood and Bolivia cañons, in Churchill county, and located for town-site and mill and furnace purposes January 2nd, 1893, containing about twenty-three (23) acres. The said mines, mining claims, and mining ground are the same mentioned in certain articles of agreement entered into between the parties hereto, and dated the fifteenth day of October, 1894. [Clauses 3 and 4 of the original agreement are here set forth in full.] Together with all the dips, spurs, and angles, and also all the metals, ores, rock, and earth in said mines and mining claims, and all the rights, privileges, and franchises thereto incident, appendant, and appurtenant, or therewith usually had and enjoyed, and also, all and singular, the tenements, hereditaments, and appurtenances thereto belonging or in any·wise appertaining, and the rents, issues, and profits thereof. To have and to hold, all and singular, the said premises, together with the appurtenances and privileges thereto incident, unto the party of the second part, its successors and assigns, as and for additional security to said party of the second part for the performance by the party of the first part of, all and singular, the terms and conditions by said party of the first part to be performed under and by virtue of said articles of agreement between the parties hereto, dated October 15, 1894; and when the purposes and objects of said agreement have been fully carried out, and all of the obligations of the party of the first part thereunder fully performed by it, then the property hereby conveyed shall be reconveyed to the party of the first part by the party of the second part. Upon the payment to said party of the second part of all moneys agreed to be paid by said clause 3 of said agreement, the said party of the second part shall immediately deliver to said party of the first part, its successors or assigns, the possession of all the property hereby and herein conveyed, and after such delivery, and until the payment of the moneys and bonus provided by said clause 4 of said agreement, this conveyance shall be and continue as a mortgage to secure to said party of the second part the payment of said bonus, which payment may be made as follows, to wit: The sum of eight hundred pounds on or before the first day of November, one thousand eight hundred and ninety-five, and the sum of one thousand six hundred pounds on or before the first day of November in each of the four following years.

"In witness whereof, said party of the first part has caused these presents to be signed by its president, and its corporate seal to be hereunto affixed by its secretary, both thereunto duly authorized, the day and year first hereinabove written.    The National Nickel Co.,

"A Co. Formed under the Laws of the State of Illinois,
"By John Leighton, Prest.

"[Corporate Seal.]    By S. F. Field, Asst. Secy."

(Duly stamped and acknowledged.)

Exhibit C:

"Memorandum of agreement made the twentieth day of May, one thousand eight hundred and ninety-five, between the within-named Nevada Nickel Syndicate, Limited, of the first part, the within-named National Nickel Company, of the second part, and the within-named John Leighton, of the third part: Whereas, further sums beyond the sum of four thousand pounds within mentioned are required for the purposes within mentioned, and the company has applied to the syndicate to advance such sums as may be required, not exceeding one thousand five hundred pounds, which they have agreed to do in consideration of the company and the within-named John Leighton entering into these presents: Now, it is hereby agreed as follows: (1) The within written agree-

ment shall be read and construed as if the sum of five thousand five hundred pounds were inserted in the second clause in lieu of four thousand pounds, and as if the sum of one thousand one hundred pounds were inserted in lieu of eight hundred pounds throughout the said agreement, and as if the sum of two thousand two hundred pounds were inserted in lieu of one thousand six hundred pounds throughout the said agreement, and as if the sum of nine thousand nine hundred pounds were inserted in lieu of seven thousand two hundred pounds in the fourth clause of the said agreement. (2) All securities and guaranties which have been sealed and executed in relation to the within written agreement shall have the same force and effect as if the said agreement had originally been modified in clause one hereof.

"In witness whereof, the National Nickel Company has caused its common seal to be hereto affixed and these presents to be signed by its president and assistant secretary the day and year first above written.

.                                        "John Leighton, Pres.
                                         "S. F. Field, Asst. Secy.   [Corporate Seal.]
                                         "John Leighton."

(Duly witnessed, stamped, and acknowledged.)

Attached to this agreement was a memorandum giving a description of the property, the same as is set forth in Exhibit B.

In order to fully understand the legal issues presented in this suit, it will certainly be proper, if not absolutely necessary, to give an outline history of some of the various transactions between the respective parties which led up to the execution of these documents, and of the manner in which the subsequent affairs relating thereto were conducted. The record is voluminous, the pleadings verbose, the testimony prolix, the arguments of counsel lengthy and exhaustive. To quote from one of the briefs of counsel, "We are driven to the task of wading through a labyrinth of mazy rubbish of straw and chaff to get down to the small quantity of grain for which the court will seek in unraveling this tangle in its final judgment."

### History of the Case.

The National Nickel Company, defendant herein, was incorporated August 27, 1886. The object for which it was formed was the "mining, working, and refining of nickel and other mineral ores and metals, and the purchase and sale of nickel and other metals and mineral ores, in the state of Nevada and elsewhere," with a capital stock of $5,000,000, consisting of 500,000 shares, of the par value of $10 each; having its principal office located in Chicago, Ill. The record only shows two meetings of the board of directors, which are here given: (1) "Meeting of the board of directors of the National Nickel Company, held on January 1, 1894, at No. 3 Popesead alley, Cornhill, London, England. Present: John Leighton, S. F. Field, W. R. Goodbody, D. J. Noyes. * * * The certified copy of the proceedings of the stockholders at their annual meeting held at Chicago, Illinois, December 7, 1893, was then submitted to the meeting. On motion duly seconded, the board proceeded to elect officers of the company for the ensuing year, with the following result: John Leighton, president; John W. Lanehart, secretary; Charles E. Brooks, assistant secretary,—by unanimous vote." An amendment to the by-laws was then adopted, relative to the election of an assistant secretary. (2) "Meeting of the board of directors of the National Nickel Company held on the 13th day of October, 1894, 3 p. m., at No. 7 Nottingham place, Marylebone road, London, pursuant to the call of the president. Present: John Leighton, Wm. R. Goodbody, Daniel J. Noyes, and Sylvester F. Field. The meeting was called to order by the president. After reading and approval of the minutes of the meeting, a resolution authorizing the execution of the contract submitted with the Nevada Nickel Syndicate, providing for the erection of plant at the company's mines in Nevada, was unanimously adopted. All voting. On motion duly seconded, a resolution granting to W. R. Goodbody an allowance of five per cent. of the net profits of the company on the working, after this date, of its mines, was, after full discussion and consideration, unanimously adopted. All voting." And at this meeting William J. Potter, who had been elected a director at a meeting of the stockholders, declined to accept the position, and

Frank Pocton was chosen to fill the vacancy in the board of directors. The meeting adjourned, subject to the call of the president.

Notwithstanding the large number of stockholders (over 250), this corporation, with its paid-up capital, was short of funds required to carry out its object of working its mines. Among the stockholders who figure prominently in the testimony in this case are John Leighton, its president, having 135,150 shares of its capital stock; Charles Bell, the original locator and owner of the nickel claims in the state of Nevada, 25,000 shares; William R. Goodbody, 25,000 shares; D. J. Noyes, with 5 or 6 shares,—just enough to authorize his election as a director. Goodbody and Noyes are the most important witnesses in this case,—Goodbody for the complainant, and Noyes for the defendant. They were the principal promoters of the mining venture, enterprise, or scheme, for the carrying out of which the corporations herein were respectively organized. In 1889 a contract was entered into by John Leighton with William R. Goodbody and D. J. Noyes in relation to the sale of Leighton's shares of stock in the company, and also of certain other shares placed under his control for that purpose. By the terms of this contract the shares were to be sold at the par value of $10 each, and Goodbody and Noyes were to receive for their services a commission of 50 per cent. of the moneys received from such sale. Under this contract Goodbody and Noyes in 1889 disposed of $18,000 worth of stock. These sales were principally made by Goodbody to his brothers, and other relatives and friends, in England and Ireland. In 1891 Leighton visited England, and endeavored to enter into negotiations for the floating of the stock of the company through Abel Rey & Co. Pending these negotiations a further contract was made between Leighton and Goodbody and Noyes whereby they agreed for a commission of 20 per cent. on the amount of shares that might be taken by Rey and his friends, but this scheme fell through. The attention of the promoters was then directed to other channels. Pending the negotiations with Rey they learned that F. W. Martino, whose name figures prominently in the subsequent proceedings, had the confidence of Rey & Co., Thomas Bolton & Sons, and others of prominence and influence. They consulted together as to the formation of a new scheme to raise £10,000, which they considered would be sufficient to erect a plant for the reduction of the nickel ore. In discussing the plan to be adopted, Goodbody suggested that if they could control the services of Mr. F. W. Martino as an engineer to put up a plant, and could also procure an order from Thomas Bolton & Sons for enough nickel to supply a sufficient amount to repay the money which the plant would cost, he could secure the formation of a syndicate with subscriptions among his friends to that extent, provided a contract between the National Nickel Company and such a syndicate could be procured, by which the syndicate would advance the money, and receive through the sale of this contained nickel in matte the repayment of the principal advanced, and the bonus on such principal of 200 per cent., which should be payable out of the product of the mines. They had no authority in this matter, and no interest therein, except the benefits that might accrue to them by the erection of the plant, and obtaining such products from the mines as would enable them to make a sale of the shares of stock, and realize their commissions under their contract with Leighton. Among other preliminaries, Noyes obtained £100 from Leighton, and went to Sheffield, and secured a month's option on Mr. Martino's services as an engineer, and expert in the refining of nickel, at a salary of £1,000 a year. If the option was accepted within the month, the £100 was to go on the year's salary, and, if not accepted, the money was to be forfeited. Mr. Noyes then visited Mr. Bolton, and obtained from him an agreement to purchase a limited quantity of contained nickel in matte; the object being to provide the necessary means for the repayment of the money to the syndicate. Armed with these and other assurances, Goodbody went to his wealthy relatives and friends. The syndicate complainant herein was organized October 15, 1894, for the purpose of furnishing the necessary capital to erect a plant to reduce the ore, and ship the product thereof to Thomas Bolton & Sons. The directors of this corporation were Alfred Goodbody, Thomas A. Goodbody, Samuel Watson, W. C. Goodbody, and Theodore Godlee. Mr. Goodbody, as the representative of the syndicate, Mr. Noyes, as the representative of the National Nickel Company, or of John Leighton, its president, clothed with author-

ity to turn over the property to the syndicate, and Mr. Martino, with the authority expressed in the contract A, started for America the latter part of October, 1894. Mr. Walter C. Goodbody, brother of W. R. Goodbody, accompanied them. On the way to America there was much discussion between these parties as to their relative duties, positions, status, powers, and authority. Goodbody testifies that Noyes came as the representative of the National Nickel Company, that Martino came as the agent or representative of the National Nickel Company, and that he (Goodbody) was to pay out such moneys as would be remitted to him by the syndicate, and that he came as the representative of the syndicate. According to the testimony of Noyes, Goodbody claimed to have full control of all matters to be performed under the contract, that he was the superintendent, and had control over Martino, and that the National Nickel Company had nothing whatever to do with Martino, and that his (Noyes') duty was limited to the provisions of the contract, and was simply to turn over the property, as the agent of the National Nickel Company, to the syndicate, and that his powers would then cease in connection with the whole affair.

The parties arrived in America, and visited Chicago, where Martino and Goodbody examined and priced machinery that might be needed. At Denver and Salt Lake they examined some smelting works and machinery for the purpose of acquiring information with reference to the cost of machinery, and ascertaining the most available methods of erecting the plant. The parties arrived at Lovelock, Nev., a railroad station near the mines. Charles Bell, then superintendent of the National Company, had been telegraphed for, and met them at the station. Mr. Godlee, the solicitor of the syndicate, had previously requested the recorder of Churchill county to give a certificate as to whether or not there were any debentures on the property of the National Nickel Company. An abstract of title and the certificate were delivered to Goodbody at Lovelock. At this point Noyes testifies that Martino was anxious to go to San Francisco at once; that Goodbody positively refused so to do, asserting that he had sole authority and direction as to what was to be done, and that he had determined that an inspection should be first made of the mines; they all visited the mines; remained there about two days. Noyes testified that on this visit he offered to deliver the property to Goodbody, as the superintendent of the syndicate, but that Goodbody declined to accept the possession until he had the opportunity of consulting an attorney, and obtaining an opinion as to whether the certificate of the recorder was in proper form, so as to give adequate assurance that there were no mortgage debentures on the property. The parties proceeded on their journey to San Francisco, and upon their arrival there Goodbody received the original contract, A. This was read over and examined by Goodbody, Noyes, and Martino. Noyes testified that he sat down with Goodbody, and went over the contract particularly to show him that the only condition, in limiting the performance of the contract by him as the representative of the syndicate, was the question of whether there were any mortgage debentures upon the property. Noyes contended that the certificate of the recorder of Churchill county showed that there were no mortgages on the property, but suggested to Goodbody that it would be a good idea to return that certificate to the recorder, and have him certify that there were no judgments, attachments, or liens of any kind of record against the property, and that this was done. Divers conversations were had; Noyes constantly urging Goodbody to accept the property, and to do something in regard to it. In the meantime Goodbody, who testified that he acted as the representative of the syndicate and under their instructions, called upon Mr. Deal, an attorney at law, and employed him for the purpose of obtaining legal advice whether the syndicate had good security for the money that was about to be advanced, and that he was advised by Mr. Deal that the agreement A, as drawn in London, was not good security, under the laws of the state of Nevada, for the moneys proposed to be advanced. Further meetings were had between the parties. The attorney visited the county seat of Churchill, made an examination of the title, and found that no location of the Ætna had ever been recorded. The syndicate's representative was informed that it could not be compelled to advance the money called for by the contract. Consultations were had. Bell relocated the Ætna, and conveyed it to the National Company.

Then came the suggestion that Bell, having been superintendent of the National Nickel Company, might have a claim or lien against the property. This was disposed of by getting Bell to consent to the postponement of any lien which he had or might have to that of the syndicate under their contract. An agreement to this effect was thereafter properly and satisfactorily executed. Goodbody next informed Noyes that the syndicate would insist upon having a deed of the entire property, to be executed in their favor by the National Company, and assured him that, if this should be done, they could then go on with the execution of the contract. Meetings were held, matters discussed, and Noyes replied that Goodbody was asking for something that was absolutely impossible to be done, that there was no such provision in the contract, and that it was impossible for the National Company to execute either a deed or a mortgage, because no quorum of a board of directors could be obtained to act with reference to it. The upshot of this controversy was that through the aid of a Mr. Abbott, who had some interest in the success of the enterprise, as a friend of Leighton, it was finally agreed by Abbott, Bell, and Noyes, on condition that the syndicate, by its representatives, should at once proceed vigorously to perform its contract, that they would use their best endeavors to secure the ratification of Exhibit B, which had been changed in form from an absolute deed, so as to make it in legal effect a mortgage, provided Leighton executed it. On December 11, 1894, the discussions between the parties culminated in the execution and delivery of Bell's agreement to waive his priority of lien in favor of the syndicate, and a deed of the Ætna claim, by Bell to the syndicate, an agreement by the syndicate to employ Bell, and an instrument, executed by Noyes, transferring the possession of the property to Goodbody as the representative of the syndicate.

Leighton testified that he received letters from Noyes, Abbott, and Bell in the latter part of December, 1894, but was unable, after careful search among his papers, to find any of them. He stated the substance of the letters, substantially in accord with the testimony of Mr. Noyes, as follows: "All those letters stated that a demand had been made by W. R. Goodbody for additional security, in the form of a mortgage deed, which could not be given by the National Nickel Company, because of the absence from London of two of the directors, not leaving a sufficient number to constitute a legal meeting of its directors for action. The substance of these letters, aside from the above statement, was to the effect that after consuming a considerable time in urging the representative of the syndicate and its superintendent of works, W. R. Goodbody, to proceed with the work in accordance with the contract, Exhibit A, and the stipulation on the part of the syndicate therein contained, an arrangement had been effected with him by them that work would go on, and the contract would be promptly and vigorously carried out, provided I would execute a mortgage deed such as had been prepared and forwarded to Theodore Godlee,—this deed to be given and accepted subject to the further action, approval, and ratification of the board of directors of the National Nickel Company, when a legal quorum of the board could be convened,—and that these three persons, viz. Messrs. Abbott, Noyes, and Bell, had personally agreed with the representative of the syndicate, W. R. Goodbody, that on condition the contract, Exhibit A, was so faithfully carried out by the syndicate, that they would exert all their influence and endeavor with the company and myself to secure such ratification, and validate such deed, if given by me." Then, with reference to what occurred between himself and Godlee, he testified as follows: "I received the deed [Exhibit B] from Theodore Godlee at his office, 26 Cannon street, London, E. C. When I called for it I stated to Mr. Godlee that I should execute and deliver the deed under the arrangement made with W. R. Goodbody at San Francisco, of which I had been advised by letters, the substance of which I then stated to him, inasmuch as it seemed to be the only way to secure progress, although I had no authority whatever, and could obtain none, for doing so. Mr. Godlee replied that he knew nothing about the matter till receipt of the deed a day of two previously, and that he and the syndicate relied entirely on their representative (W. R. Goodbody) in San Francisco, and he (Godlee) would not take any responsibility; I must do as I thought fit in regard to it. I then executed the deed, and delivered it to him, with the distinct statement that its validity and effect was to be subject to the actual ap-

proval and confirmation of the board of directors of the National Nickel Company, and its action, but that I thought the board would ratify and confirm it if the contract [Exhibit A] was promptly and vigorously executed by the syndicate."

Goodbody, Noyes, and Martino remained in San Francisco about three weeks after the preliminaries were settled. Goodbody notified Noyes that he and Martino were daily at work, devoting their time assiduously to the performance of their duties, and had made considerable progress in the arrangements for freight, purchasing materials for carrying on the work, and various other matters connected with it. Noyes left San Francisco and went to New York about the 1st of January, 1895. Goodbody testified that during January, 1895, Martino secured the services of H. P. Gregory & Co. to purchase the necessary machinery, and employed Henry Gray, of that firm, as an assistant engineer, to erect a plant, and that Martino also employed Charles Bell as assistant superintendent at a salary of $150 per month; that Martino also purchased from John Taylor & Co., purveyors of chemicals in San Francisco, an invoice of chemicals amounting to $504.18, to be used in a laboratory that he afterwards established at the mine. There are hundreds of pages of testimony detailing the purchases that were made by Martino and Goodbody, of itemized bills, receipts therefor, and checks that were drawn in payment thereof, and of like bills, receipts, and checks for labor at the mine.

The erection of the plant was commenced under Martino's supervision in April, 1895, and completed in June, 1895. The plant consisted of a reverberatory furnace, made of fire bricks and iron, a tubular boiler of the value of $300 or thereabouts, a 23 horse power engine of like value, pulleys and shafting, etc. In the erection of the furnace about 20,000 bricks were used. They paid $42 per 1,000 for the bricks. They were bought in San Francisco. A competent brick burner in Nevada offered to burn and deliver the bricks at the mines for $13 per 1,000. The building or shed over the works was 60 by 30 feet. The roof was made of corrugated iron, supported by six cast-iron posts, three on each side, measuring about 13 inches in diameter, and weighing about 1,800 pounds. 4x4 wooden posts, obtainable at the mine, would have been amply sufficient to sustain the roof. No attempt was ever made to smelt any ore in this reverberatory furnace. Mr. Martino informed Goodbody that he could smelt the nickel ore, but that it could not be done with a profit. At this point Goodbody said that he could not see any object in going on with the work, if that were so. They both left the mines, and went to San Francisco. Martino did not return. He left in apparent disgust, and, to quote his words, "went home a sadder and wiser man." In a report made by Goodbody to the syndicate, explaining why no smelt was made, and why he assumed management without authority, he, among many other things, said: "Although I understood from Mr. Martino that the plant was complete, and ready to commence smelting, still day after day passed by without anything being done; Mr. Martino spending the greater part of his time in the laboratory. I asked him at last when he intended to commence smelting. He replied that he was making some very important tests, and that when they were finished he would have a consultation with me. The following evening he * * * told me that he had completed his tests; that he was sorry to say that the result proved the whole business to be a swindle; that, although there was plenty of nickel in the mine, it was of an entirely different character from the samples that had been supplied to him at Sheffield; that, had the bulk been of the same character as the sample, it would have almost fluxed itself, but that as it was it would take about three tons of added material to reduce one ton of this ore, and that he did not know how this material could be obtained, but that, if it could be obtained, the cost of buying it and delivering it at the mine, taken in conjunction with the large amount of fuel consumed in fluxing the ore, together with the cost of labor, freight, etc., would result in the matte costing more to make than it was worth. He then proceeded, in very vigorous language, to denounce the National Nickel Company and Mr. Bell, and wound up by saying that if I thought well of it, after what he had told me, he would go on with the smelting. I said in reply, in the face of the statement he had just made, I could not see how it could be to the interest of either the syndicate or National Nickel Company to do so." After stating that Martino made certain sugges-

tions as to how a plan could be arranged for raising more money, and that he (Goodbody) questioned whether the syndicate would be a party to such a plan, and that Martino said: "Why not? That it would only be swindling swindlers, and, so far as he was concerned, nothing would give him greater pleasure," —he proceeded to give an account of his subsequent management. Among other things, he said: "On arriving at San Francisco, I saw Mr. T. E. Jewell, * * * and laid all the facts of the case before him. He told me that he had known of the National Nickel Company's mines for several years, and would be glad to assist me in any way in his power. He said further that, from the many conversations he had had with Mr. Martino from time to time, he had made up his mind that, whether his claim to be a great scientist and chemist was true or not, he had long since decided that he knew nothing about the smelting of ores,—at any rate, in America. Mr. Jewell advised me to engage a competent smelter, and erect a small water-jacket furnace, for the purpose of demonstrating whether the ore could be profitably smelted or not. I thought the matter carefully over. There appeared to be two courses open to me, —one, to abandon the enterprise altogether, and return home, in which event it seemed to me the money of the syndicate would probably be lost; the other, to take the responsibility on myself of risking the loss of the balance of the syndicate's capital by following Mr. Jewell's advice. I decided to take the latter course. The first step I took was to telegraph to Dr. Banks to send me down some fair samples of ore. On receipt, I had them assayed, and found that they contained, contrary to Mr. Martino's statement, a large percentage of arsenic." He also states in the report that Mr. Noyes "told me that he highly approved of the action I was taking, and that I could rely on his backing me up in every way in his power. At the same time he undertook not to interfere in any way." Further on in the report he says: "It was unfortunate that I was not advised by the syndicate of the supplemental contract entered into by them, undertaking to advance the National Nickel Company an additional fifteen hundred pounds. The first I knew of it was being shown a copy by Mr. Noyes. Had I known from the time I took over the administration that I could rely positively upon receiving this amount, even though it was remitted in installments, I should have made very different arrangements, which would have resulted in the smelting being permanently established. * * * I should like to say in conclusion that, from the personal knowledge I have gained of the mines and their surroundings, I believe that with an additional capital of about two thousand pounds, and with a confirmatory order from Messrs. Bolton & Sons, a very large and profitable business could be done."

Mr. Martino, in a letter found in the testimony in this case, charged Goodbody with being ungrateful, and, among other things, said "that he had never consented to be made either a fool or a rogue of, nor a cat's-paw to pull chestnuts out of the fire for others"; that he went out to establish an industry by which those who sent him should not lose their money; that, when he came to examine the ore on the dumps, he "found about thirty-eight per cent. of common stones, containing not a trace of nickel"; that the remainder was an ore of an entirely different character from what they had been led to believe; that he reported the facts to Mr. Goodbody, and discussed the subject in all its bearings, "when I, as an expert, not only as a smelter, but as a buyer of matte, and as a refiner of matte, of over thirty years' experience, pointed out to him that the discovery altered the whole aspect of affairs; that now, instead of having an excess of the so-called agitator [the arsenic], we have nothing like the sufficient quantity; that the ore itself, instead of being an easy-smelting one, is, by virtue of its constituents, a refractory one; * * * that we could smelt them, but that we could not smelt them at a profit; that in fact his people were likely to lose money by every sale of such matte. * * * I threshed out the whole subject, as an expert, and proved my arguments step by step, and he fully concurred. * * * I said: 'We have now to decide whether we are to go on, which means, are we to use the one thousand pounds which your people remitted, and then ask for more, and continue this little game until they find out for themselves that we are losing their money, knowing all the time we are playing a dishonest game, or had we not better stop short, right here, go home, and make a clean breast of

everything?'" The actual time that Martino and Goodbody expended at the mines was about 30 days.

After Mr. Martino left for England, Goodbody employed Dorwin as a smelter, at a salary of $250 per month, and T. E. Jewell as assistant smelter, at a salary of $150 per month. When a fire was started in the reverberatory furnace for the purpose of burning out the bridges, the furnace cracked in several places in such a manner as to render it entirely useless, and it was torn down. Then a small water-jacket, 16-inch furnace, which would reduce about 3 tons of nickel ore a day, was erected, and 12 or 14 tons of ore, averaging about 16 per cent. nickel, were run through the furnace, when it exploded. In the language of one of the witnesses, "the furnace took a rise and went out of the building," injuring several of the workmen. About 3 tons of contained nickel in matte were obtained from this working of the ore, and this was the actual result in value of the "entire output of all the expenditures made at the mine by the Nevada Nickel Syndicate, Limited." The life of the enterprise as a going concern expired with the collapse of the furnace.

W. E. F. Deal, for complainant.

G. W. Baker, for defendants.

HAWLEY, District Judge (after stating the facts as above). The foregoing statement of facts was prepared for the purpose of shedding a calcium light, by the rays of which the general nature and character of this suit might be more clearly seen and better understood. The statement will at least serve as an X-ray to enable the court the better to diagnose the conditions, troubles, and difficulties under which the respective parties acted. Under the free and unlimited strictures of counsel in their oral arguments, the respective parties and their witnesses have been presented to the court as "perjurers," "swindlers," "thieves," "Shylocks," "robbers," "idiots," and "fools," who have been guilty of all the frauds in the catalogue of superlative rascalities. To such an extent did these charges and counter charges go, that the court was almost convinced that the case ought to be dismissed as one unworthy of consideration in a court of justice. A plain, unvarnished statement of the facts was all that was needed to enable the court to arrive at the truth. Much of the testimony seems to have been given for the express and only purpose of showing that the witness under examination was free from fault, and that all the blame and censure should be placed on some other person. The suit, disrobed of all the opprobious epithets which have been so freely interspersed, while in many respects peculiar,—exhibiting much incompetency and lack of practical knowledge upon the part of the men who had control of the business affairs, and involving a great outlay of money wholly unnecessary,—is but one of many where a mining enterprise has been inaugurated under bright hopes and over-abundance of confidence, whereby the promoters, by floating the scheme abroad, and selling the shares of stock at their par value (on paper), expected to realize an immense fortune. Such wild and visionary schemes are generally detrimental to the community where the mines are situated, and often result injuriously to all parties concerned. No one connected with this enterprise seems to have thought, or even dreamed, of such a thing as failure. No precautions were ever taken by either party or any person to guard against such a result. A moment's consideration of the difficulties that might be

met would have suggested many steps that should have been taken, and many clauses in the contracts that ought to have been added, in order to afford protection to the parties against extravagance in the management of the business. But the bright side was the only one which either party looked at. In the preliminary steps all was harmonious, pleasant, and agreeable. All were men of high character, well qualified to perform the duties assigned them, and all absolutely above reproach. It was not until the dark side turned up suddenly,—until failure, instead of success, was the reward of their venture,—that the expressive terms before alluded to were hurled at each other as thick and fast as hailstones in a heavy storm. The fact is that, looking backwards, any person could easily point out many mistakes made by the parties on both sides. But, above and beyond all the personal feeling so bitterly engendered, it must be constantly remembered that in most, if not all, of the transactions, both parties acted with their eyes wide open,—with full knowledge of all the facts,—and must be bound by the legal consequences which result from the character of their agreements and conduct. It is well settled, as a general rule, that all contracts must be mutual in their obligations and in their remedies. To authorize the enforcement of the contracts in the present case, it should not only appear that they are entirely free from fraud, misrepresentation, mistake, or illegality, but it must also be clearly shown that they are perfectly fair, equal, and just, not only in their terms, but in their circumstances. The contracts and the situation of the parties must be such that the remedy of specific performance will not be harsh, unjust, or oppressive.

The contention of the defendant is that it was the duty of Goodbody, as the superintendent of the syndicate, to see that Martino did not waste the money in an extravagant and useless manner; that defendant should have been allowed to inspect the plans of Martino before the plant was erected, as it was to be charged with the money expended for its construction, and had the legal right to examine the same in order to protect itself from fraud, imposition, or loss; that Noyes had no authority from the defendant to represent or bind it by any declarations, acts, or conduct on his part in approval of the course which Goodbody pursued, either before or after Martino left; that the only authority he had in the premises was to deliver to Goodbody, as the syndicate's representative, the possession of the property; that defendant cannot, in any event, be held responsible for the additional advances made by the syndicate, not provided for in the contract A, which it claims was procured by the false and fraudulent telegram sent by Martino and Goodbody with reference to the completion of the plant; that the syndicate must be held responsible for the acts of Goodbody, its superintendent; that Goodbody had no authority, under the terms of the contract, to refuse to allow Martino to proceed with the smelting and reduction of the ores when the first furnace was completed; that Goodbody, without the consent or approval of the defendant, could not make it liable for the employment of Dorwin and Jewell, and the expenses incurred in the erection of the second furnace; that the syndicate did not, on its part, comply with the terms of the contract; that the contracts A and C are

unconscionable and inequitable in their terms, and should not be upheld or enforced in a court of equity; that the mortgage B was obtained without consideration; that it was never legally executed by the defendant; that its execution was never ratified by it; and that it should not, for these reasons, be enforced. There are divers other minor grounds specified in the brief of defendant's counsel why the syndicate should not recover the relief it seeks by its bill.

Is complainant, under the pleadings and evidence herein, entitled to a decree? The original contract between the parties was not illegal. There was no fraud in its execution, no concealment of any fact, nor any hidden meaning in any of its covenants. Its terms were freely discussed and well understood by the promoters, who engineered the transactions, and who were the principal factors that organized the respective corporations. Four of the stockholders in the syndicate were brothers of one of the promoters (W. R. Goodbody), two were his cousins, one a brother-in-law, and the other their solicitor. Both of the promoters were stockholders and directors of the defendant corporation, and one of them (Noyes) was the confidential friend and trusted agent of John Leighton, the president and a director of the defendant. At a meeting of the directors held pursuant to a call of its president, as provided for in its by-laws, a resolution was unanimously passed authorizing the execution of the contract. Its proper officers thereafter, acting under the authority of this resolution, executed the contract, and affixed the seal of the corporation thereto. It is true that, like the bond of Shylock, the contract was exacting in its terms, and, like a jug handle, was onesided. It was so written that common knowledge would enable any person of ordinary understanding to see at a glance that the covenants and conditions therein contained were all in favor of the syndicate. There were no covenants that the plant should be erected in a workmanlike manner, or that any economy, care, or skill should be exercised in its construction, or that defendant should have any voice, control, or knowledge as to the character of the materials to be used, or the kind of works that should be constructed. Everything was left entirely to an agent selected and named for that purpose. The defendant was powerless to interfere. The money advanced by the syndicate was to be handled and paid out by its own agent. There was no agreement on the part of the syndicate to erect any substantial buildings or any particular kind of a furnace, or whether the plant would be of any particular advantage or permanent benefit to the defendant, beyond obtaining the 125 tons of contained nickel in matte, and upon that product the syndicate was to have a lien for all money it had advanced, and the bonus therein specified. It was also to have the exclusive possession and control of all the property belonging to the defendant, free and clear of all liens. F. W. Martino was the agent selected by both parties as a proper, suitable, and competent person to have the charge, management, and control of the erection of the plant and the reduction of the nickel ore. Moreover, he was a man in whom the people interested in the purchase and sale of contained nickel in matte had confidence, and the evidence in this case clearly shows that this was the strongest

incentive which induced the respective parties to procure his services. His scientific and expert knowledge was conceded by both to be first-class. His practical knowledge as to the erection of a suitable plant, the purchase of materials, employment of men, and actual management of the business affairs was not discussed or considered by either side. For all his acts performed within the scope of his agency; whether he was competent or incompetent, whether his work was well or poorly done, each party is jointly responsible. He was their joint agent. Both parties must therefore be legally bound by his acts and conduct. The maxim that "no man shall serve two masters" does not prevent the same person from acting as agent for certain purposes for two or more parties interested in the same transaction, when their interests do not conflict, and where loyalty to one does not necessarily constitute a breach of duty to the other. Especially is this true in a case like the present, where both parties, with full knowledge of all the facts, consented to such an appointment.

The facts leading up to the execution of the mortgage, B, are sufficiently stated in the general history of the case. It will be noticed, by a careful reading thereof, that Mr. Noyes, assuming to act for the defendant, claimed that the execution of such an instrument was not called for by the contract, and urged Goodbody to accept the possession of the property, on the ground that the contract only required that a certificate of the recorder should be first obtained, to the effect that there were no mortgage debentures on the property. But the fact is that the contract contains provisions in clause 10 which permitted the syndicate to make demand, as it did, for more perfect security under the laws of the state of Nevada. Was the mortgage executed in such a manner as to make it binding on the corporation? When its execution was demanded by Goodbody, Noyes claimed that the demand could not be complied with,—that it was impossible for the directors to meet and authorize it to be executed; but, after many consultations, he and Goodbody, two of the directors, stated that, if Leighton would execute it, they would do all they could to procure a ratification of his acts. Leighton stated to the solicitor of the syndicate that he had no authority from the defendant corporation to execute it, and that, to be binding upon the corporation, it would have to be ratified by the board of directors, and that he would favor its ratification. From a legal standpoint it may be stated, as a general rule, that the power and authority of a corporation to execute documents is vested in a board of directors, and that this authority can only be exercised when duly authorized by its directors, and that this principle applies as well to the acts of the president of the corporation as to any other director or officer of the corporation. The individual directors, when not acting as a board, have no general authority, unless conferred by the by-laws of the corporation, to execute a deed or mortgage on its behalf. Gashwiler v. Willis, 33 Cal. 11, 20; Alta Silver-Min. Co. v. Alta Placer-Min. Co., 78 Cal. 629, 632, 21 Pac. 373; Hay-Press Co. v. Devol, 72 Fed. 717, 721; Edwards v. Water Co., 21 Nev. 469, 34 Pac. 381; England v. Dearborn, 141 Mass. 590, 6 N. E. 837; People's Bank of City of New York v. St. Anthony's Roman Catholic

Church, 109 N. Y. 512, 521, 17 N. E. 408; Grant v. Railway Co. (Minn.) 69 N. W. 23; Limer v. Traders' Co. (W. Va.) 28 S. E. 730; 3 Thomp. Corp. §§ 3906, 3908. It is equally as well settled that a document signed by the president and secretary of a corporation, with the corporate seal thereto affixed, is prima facie evidence that it was legally executed. The books are full of cases which discuss the question as to how the authenticity of a corporate seal should be established, and as to what the seal proves when it is properly authenticated. In 4 Thomp. Corp. § 5105, the author says:

"While the genuineness of the seal must be established as a fact in the mode elsewhere prescribed, yet when it is established it carries with it presumptive or prima facie proof of everything else which is necessary to the validity of the instrument. It is presumptive or prima facie evidence that the deed is the deed of the corporation, and that the officers who signed, sealed, and acknowledged it were duly authorized so to do; and the instrument is therefore admissible in evidence, if otherwise relevant. In other words, the seal carries with it prima facie evidence of the assent of the corporation to the deed. But the evidence is prima facie only. The effect of it is to shift the burden of overthrowing the deed upon the party objecting to it, and to require him to prove by clear and satisfactory evidence the want of authority to execute it."

Numerous authorities are cited in support of the text.

See, also, Ang. & A. Corp. § 224; McDonald v. Chisholm, 131 Ill. 274, 281, 23 N. E. 596.

If it be admitted that the defendant has overcome the prima facie case established by the seal, it would not, under the facts in this case, destroy the validity or binding force and effect of the mortgage. It would serve no useful purpose to discuss the exceptions to the general rule that have grown into existence by the customs, usage, and methods of transacting corporate business in different communities, under the varied conditions and surroundings in which the respective parties may be placed. So extensive has this become, that the courts have often said:

"The classes of cases which constitute exceptions to the rule have become so numerous that the exceptions have almost abrogated the rule." G. V. B. Min. Co. v. First Nat. Bank of Hailey, 95 Fed. 23, 30, and authorities there cited.

Moreover, the powers of officers of a corporation are so different in the different states and countries, owing partly to a difference in the statutes and partly in the general course and habit of dealing, that it may be said that the decisions of the courts in one state or country should have but little, if any, weight in another state or country, unless all the conditions of the cases are alike, and that questions of this character ought to be solved, not so much upon the principles of the general rule, as upon the peculiar circumstances of each particular case. If this be true, there are strong reasons why the defendant should, in the present case, be estopped from denying the authority of its officers to execute the mortgage, and to justify the court in holding that, if it did not actually consent to its execution, except in the method provided for in its by-laws, its conduct was such as to amount to a ratification thereof. To fully understand the position of the parties, we must put ourselves in their place. The defendant, being unable to erect a plant for the reduc-

tion of ores to enable it to put its mines in such a condition that its shareholders could realize money by selling shares of stock, made a contract with the syndicate whereby the necessary money could be obtained for that purpose upon certain conditions therein specified. The law implied, whether the contract was expressed in direct terms or not, that both parties should faithfully carry out the conditions imposed upon them. It was the intention of both parties that the syndicate should have security for the money it advanced in pursuance of its agreement. The contract A only provided for security upon the products of the mines resulting from the reduction of the ores, but it contained what might be termed a saving clause, on the part of the syndicate, by further providing that the defendant should execute such other deeds and documents "as may be required or deemed necessary by the legal advisers of the syndicate in Nevada for perfecting this security according to the laws there in force." The legal adviser of the syndicate deemed it necessary, in order to perfect the security under the laws of Nevada, that the mortgage, B, should be executed by the defendant. Two of the directors of defendant were present in San Francisco when the demand was made for its execution. What they did and how they acted has already been fully stated in the history of the case. Suffice it here in brief, again, to say that two of the directors said that, although they could not get a quorum of the board to hold a meeting, they would favor a ratification of the act of the president and secretary in executing the mortgage; that the president, when signing it, expressed the opinion that the board would ratify it. These three directors (Noyes, Goodbody, and Leighton) were the real representatives of the defendant in all its business plans and operations. They organized and controlled the corporation in all of its business affairs, and were the active spirits in its behalf in securing the contract with the syndicate. Field, the only other director who had ever participated in the meetings of the board, signed the mortgage in his capacity as secretary of the defendant. Now, when they agreed to ratify the execution of the mortgage, it must be presumed that they were acting in good faith, that they meant what they said, and that they would do what they agreed to do. The defendant had expressly agreed to give the security to execute any documents that might be required by complainant for that purpose. Its president and the other directors were anxious to have the money advanced by the syndicate at once, without the delay that would be necessarily incurred if they had to wait until a meeting of the board of directors could be held. Acting upon their apparent good faith, the syndicate accepted the mortgage as signed by the president and secretary of defendant, with the corporate seal affixed. No meeting of the directors as a board was thereafter had. No protest or objection was thereafter made by any stockholder, director, or other officer of the defendant, until after the enterprise in which they were engaged proved to be a failure instead of a success. In the meantime the money was advanced by the syndicate without any objection upon the part of the defendant, its officers or stockholders. Under all the facts, I am of the opinion that the defendant must be legally con-

sidered as having ratified the execution of the mortgage. The assent of the directors to its execution without a formal meeting of the board, with full knowledge on their part of all the facts, in advance of, and at the time of, its execution, ought, in equity, to be deemed the equivalent in law to a ratification thereof by the board. New York & N. J. Globe Gaslight Co. v. Metropolitan Inv. Co. of New York (Sup.) 41 N. Y. Supp. 797. This thought is in line with the principles announced in Henry v. Water Co., 10 Colo. App. 14, 24, 51 Pac. 90, 93. There the question under discussion was whether or not the trial court erred in rejecting testimony tending to show that the directors of the corporation had been informed by the president of all his acts in making a certain contract. The court said:

"We are not prepared to admit that T. C. Henry's declarations on this subject were not legitimate as original testimony. The testimony was certainly legitimate for the purpose of proving the knowledge of the directors, and therefore a ratification by the company. We cannot assent to the authorities which are cited by counsel in the petition for rehearing, that the knowledge brought home to the directors of the company is not legitimate for the purpose of establishing ratification, even though that knowledge be brought home to them individually, and not while sitting as a board. There are many authorities to the effect that notice to individual directors is not enough. But this is neither notice nor information conveyed to an individual director, nor to the members of the directory by a stranger. It must be remembered that T. C. Henry was the president of the company. He was then engaged in the active management of all of the business affairs of the corporation, charged with the duty, not only of conserving its interest, but of advising the members of the directory of his acts, that he might have the benefit both of their advice and their approval. We think it quite within the range of legitimate testimony to prove that the president, who did the act, and had apparent authority to do it, told the members of the directory what he had done, and that those directors, when thus informed of it by the president, approved of his acts. If, with this knowledge, no action whatever was taken to interfere with the contract, and the parties proceeded to its execution and completed it, it brings the case, as far as we are able to see, entirely within the range of the law of ratification."

As before stated, it was the intent of the parties that the security should be properly given, and in this light the original contract, A, might in equity be regarded as an executory agreement for a mortgage, and a mortgage executed in pursuance of its terms as a security in accordance with the expressed intention of the parties, so that in equity it would be held binding upon the parties, although not duly executed in the manner and form prescribed by the by-laws of the defendant. A court of equity will not yield to technical rules of law, by which the intention of the parties may be defeated, and it therefore can, and often does, declare that there is an equitable mortgage in cases where a court of law might be compelled to say that there was no mortgage. The mortgage, B, should therefore be upheld upon the ground that equity considers that as done which the parties agree to have done, and which in equity and good conscience ought to have been done.

In Daggett v. Rankin, 31 Cal. 322, 326, the court said:

"The doctrine seems to be well established that an agreement in writing to give a mortgage, or a mortgage defectively executed, or an imperfect attempt to create a mortgage or to appropriate specific property to the discharge of a particular debt, will create a mortgage in equity, or a specific lien on the property so intended to be mortgaged. 1 Am. Lead. Cas. Eq. 510; In re Howe,

1 Paige, 125. The maxim of equity upon which this doctrine rests is that equity looks upon things agreed to be done as actually performed, the true meaning of which is that equity will treat the subject-matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been. Story, Eq. Jur. §§ 64, 790; Will. Eq. Jur. 298, 299."

See, also, Racouillat v. Sausevain, 32 Cal. 376, 389; Peers v. McLaughlin, 88 Cal. 294, 26 Pac. 119; Ice Co. v. Meader, 18 C. C. A. 451, 72 Fed. 115, 118; Chase v. Peck, 21 N. Y. 581, 583; Payne v. Wilson, 74 N. Y. 348, 351; Fidelity Insurance, Trust & Safe-Deposit Co. v. Shenandoah Valley R. Co., 33 W. Va. 761, 771, 11 S. E. 58; Margarum v. Christie (Fla.) 19 South. 637, 639; Cummings v. Jackson (N. J. Err. & App.) 38 Atl. 763, 765; Jones, Mortg. (4th Ed.) § 162; Walker v. Brown, 165 U. S. 654, 664, 17 Sup. Ct. 453; 10 Am. & Eng. Enc. Law, § 127; and authorities there cited.

In Payne v. Wilson the court said:

"An equitable mortgage may be constituted by any writing from which the intention so to do may be gathered, and an attempt to make a legal mortgage, which fails for the want of some solemnity, is valid in equity. Miller, Eq. Mortg. 1, 2. And it has been held that an agreement for a mortgage is, in equity, a specific lien upon the land. In re Howe, 1 Paige, 125; Chase v. Peck, 21 N. Y. 581."

The vital question is whether the syndicate has fully complied with its agreement, so as to entitle it to recover from the defendant the amount of money it advanced, together with the bonus as specified in the contract. The original contract necessarily implied that suitable works should be erected. The syndicate was bound to exercise reasonable care in the erection of the buildings, in the purchase of necessary machinery, and the construction of the furnace. The testimony does not show that the machinery purchased by Martino was defective or unsuitable, nor that the furnace, as constructed, but for the accident, would not have proved effective in the reduction of the ore. But, be that as it may, one thing is certain: For the extravagance and incompetency of the men in charge both parties were equally at fault, and, the defendant having expressly covenanted that the men selected should have the charge and management of the work, it cannot deprive the syndicate of the right to recover the amount of money actually expended by it because the men selected by both parties were incompetent.

The moneys obtained under the supplemental contract, C, and money actually expended by Goodbody after Martino left, present a further question, by no means as easy of solution. It is earnestly contended by counsel that defendant cannot be held responsible for the money advanced under the supplemental contract, because the defendant was induced to sign this contract upon the statement contained in a telegram as follows:

"4 Mo. 26, 1895. To Godlee, Solicitor, Cannon Street: Plant completed. Capital expended. Martino's corrected measurements show eleven hundred tons good ore. Fifteen hundred pounds necessary to make and ship matte. Martino. Goodbody."

This telegram was sent before the first furnace was completed, and its contents were not absolutely true. But, from all the testi-

mony in regard thereto, I am of opinion that it was sent without any design to actually defraud anybody. It was highly colored, because the senders thought they would, and did, need the money to complete the contract. The money thus obtained was actually advanced by the syndicate, and afterwards expended by Goodbody in endeavoring to complete the works. Goodbody may not have selected the best course to be pursued after Martino left. It may be that it would have been better, as he said, "to abandon the enterprise altogether and return home," or, as expressed by Martino, "better stop short, right here, go home, and make a clean breast of everything." But as much could have been said against that course as is urged now, perhaps more. Without going into all the details of Goodbody's action, it is deemed enough to say that the syndicate advanced the money in apparent good faith, without any fraud,—intent or design to defraud the defendant or deprive it of its property. Noyes and Leighton, who were the sponsors for the defendant, made no objection to such further steps being taken, and they knew what was going on. The defendant acted upon their knowledge, and signed the supplemental contract, and for all the money actually advanced by the syndicate thereunder it must be held responsible.

But how about the bonus? While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the parties who come before it as complainants. Whoever comes into a court of equity must come with clean hands. The contract contemplated that 125 tons of contained nickel in matte should be produced. The money was advanced for that purpose. This was the inducement for the defendant to sign the contract. This part of the contract was never complied with. The contract A, as before stated, does not contain any covenant touching the conditions that might arise by the failure of the enterprise. It was drawn upon the theory that success was sure to crown their efforts, provided the money as specified therein was advanced by the syndicate. Such was evidently the view entertained by the syndicate, as well as the defendant, and by John Leighton. It was the intention of all the parties to the agreement that 125 tons of contained nickel in matte should be produced, and, when this matte was ready for shipment, then the bonus provided for became due. This is to be implied by a fair and reasonable construction of clauses 3 and 4 of the original contract, A, and the interpretation to be given them necessarily controls the provisions contained in the supplemental contract, C. The reasons heretofore given for holding defendant liable for the money advanced by the syndicate do not apply to the bonus. After carefully reading the contract A, and especially clause 3, can it be said that it was the intention of the parties, if the 125 tons of contained nickel in matte was not produced, that the bonus mentioned therein was to be paid? I think not. When the object and purpose of the agreement, the situation and surroundings of the parties, are considered, it seems to me that the construction given to these clauses is within the intent

of the parties, and within the meaning of the words, as expressed in the original contract. But, in any event, the bonus ought not, in equity, to be decreed upon the contract, because to allow a recovery therefor, under all the facts and circumstances of this case, would be unconscionable. If the "pound of flesh" is to be given to the syndicate, without proving that any actual benefit has been received by the defendant, it certainly ought to show that it has literally complied with all the provisions of the contract on its part to be performed. In holding the defendant liable for all the money advanced, the court has proceeded upon the theory that it could not take advantage of its own wrong and refuse to pay anything because the contract was not literally complied with; that it was but fair and just that it should pay back this money for its own folly in entering into such a one-sided contract. But there is no sound reason why it should be further mulcted in a bonus of 200 per cent. It never agreed to pay the bonus upon condition that the works erected by the syndicate should prove a failure. If it had so agreed, such a contract could not have been enforced, because it would be invalid and without consideration. No one could be held responsible for such an inequitable, unjust, and unconscionable agreement; and yet that is substantially, in effect, what is contended for by the syndicate in the present case.

If the matte had been produced as specified in the contract, it would have been worth about $50,000, and there could have been several strong reasons advanced on behalf of the syndicate as to its right to recover the bonus. Such compliance with the contract as was contemplated by the parties would have put the defendant, financially, on its feet, and might have enabled the promoters to have successfully carried out their scheme of disposing of the stock of the company at par, and all of defendant's stockholders might have been benefited thereby. In such an event, considering the conditions existing at the time the contract was made, the defendant could have well afforded to pay the bonus, and, there being no usury laws in this state, it may be that the syndicate would be entitled to recover it, although it would have been, even then, "a windfall, like a prize in a lottery"; but to allow the syndicate to recover the bonus without complying with this part of the contract would be giving something for nothing; it would be giving it outright the sum of $57,008.22, for which it had not paid any adequate consideration, or performed any act to entitle it to recover it, as a matter of equity. The defendant has received no benefit whatever from the contract. It would be contrary to the principles of eternal justice, and in violation of all the rules of equity in the exercise of its extraordinary powers, to allow the syndicate to recover the bonus. The rule is universal that a specific performance will always be refused "when the contract itself is unfair, one-sided, unconscionable, or affected by any other such inequitable feature, and when the specific enforcement would be oppressive upon the defendant, or would prevent the enjoyment of his own rights, or would in any other manner work injustice." 1 Pom. Eq. Jur. § 400, and numerous authorities there cited; Dalzell v. Manufacturing Co., 149 U. S. 315, 325, 13 Sup. Ct. 886, and authorities there cited. As was said in Railroad Co. v. Cromwell, 91 U. S. 643, 645:

"The court is not bound to shut its eyes to the evident character of the transaction. It will never lend its aid to carry out an unconscionable bargain, but will leave the party to his remedy at law. This has been so often held on bills for specific performance, and in other analogous cases, that it is unnecessary to spend argument on the subject."

A specific performance is not a matter of absolute right. It is always within the sound judicial discretion of the court, to be exercised according to the settled principles of equity, with special reference to the facts of each case. See Willard v. Tayloe, 8 Wall. 557, 567; Hennessey v. Woolworth, 128 U. S. 438, 442, 9 Sup. Ct. 109; Manufacturing Co. v. Gormully, 144 U. S. 224, 236, 12 Sup. Ct. 632; Waite v. O'Neil, 72 Fed. 348, 359; 1 Story, Eq. Jur. § 742. In Earl of Chesterfield v. Janssen, 2 Ves. Sr. 125, decided in 1750, the court had under consideration a contract made by John Spencer, whereby he obtained £5,000, for which he obligated himself to pay £10,000 at, or soon after, the death of his grandmother, from whose estate he had an expectancy, if he survived her, but to be totally lost if she survived him. He survived her for a short time. About two months after her death he executed a bond in the penalty of £20,000, conditioned for the absolute payment of £10,000 at or before a specified date, and executed a confession of judgment thereon, which was duly entered. Spencer paid £2,000 thereon, and, after his death, Janssen applied for an execution. The executors of Spencer's estate applied to the court for relief upon payment of the £5,000, with interest from the time of advancing it. The case was disposed of upon the ground that there had been a confirmatory contract after the contingency mentioned in the first contract had happened, wherein Spencer bound himself to execute it, and the court gave relief only against the penalty of the bond. But the opinions therein upon the nature of unconscionable bargains are interesting, and have some bearing upon the principles involved in this case. Burnett, J., after discussing the question of usury and bottomry, said:

"The next point is, supposing it not a contract within the statute, whether it is not such an unconscionable bargain, obtained of an expectant upon his expectancy, as the court is warranted, on precedents, to relieve on paying the sum advanced, with interest from the time of advancing. * * * On one hand, I should apprehend it would be too large to say in no case an heir or expectant could borrow money on his expectancy; and yet to let him borrow without any advantage to the lender seems to put him under difficulties. * * * An heir, if hindered from supporting himself by these means, might starve in the desert, within view of the land of Canaan. On the other hand, I should dread the consequence of giving the sanction of this court to future bargains."

Lee, C. J., said:

"I think it will be well worth the consideration of a court of equity whether they will not interpose in case of these hazardous bargains to pay double, so as to prevent the lender's going away with such an exorbitant gain. * * * By the cases cited and stated in courts of equity, it appears they have used a sagacious attention to discover whether there is any fraud expressed, or, from the nature of the transaction or person concerned, anything carrying on the face of it an appearance of imposition. * * * A court of equity has disabled them from taking advantage thereof, and interposed to prevent unconscionable bargains."

Lord Chancellor Hardwicke said:

"It cannot be said that such contracts deserve to be encouraged, for they generally proceed from excessive prodigality on one hand, and extortion on the other, which are vitia temporis and pernicious in their consequences; and then it is the duty of a court, if it can, to restrain them. This court has an undoubted jurisdiction to relieve against every species of fraud."

He then arranged the cases of frauds that would avoid contracts under four heads. The second he states as follows:

"It may be apparent from the intrinsic nature and subject of the bargain itself, such as no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept on the other, which are inequitable and unconscientious bargains; and of such even the common law has taken notice."

See, also, 1 Story, Eq. Jur. § 188.

There are numerous cases, both of ancient and recent date, which hold that upon certain contracts the jury may give less damages than the debts amount to. James v. Morgan, 1 Lev. 111; Thornborough v. Whitacre, 6 Mod. 305, 2 Ld. Raym. 1164; Cutler v. How, 8 Mass. 257; Same v. Johnson, Id. 266; Leland v. Stone, 10 Mass. 459; Baxter v. Wales, 12 Mass. 365; Greer v. Tweed, 13 Abb. Prac. (N. S.) 427; Russell v. Roberts, 3 E. D. Smith, 318; Scott v. U. S., 12 Wall. 443, 445; Railroad Co. v. Cromwell, 91 U. S. 643, 645; Hume v. U. S., 132 U. S. 406, 412, 10 Sup. Ct. 134.

In Scott v. U. S., the court said:

"In cases like this it is the duty of the court to assume the standpoint occupied by the parties when the contract was made, to let in the light of the surrounding circumstances, to see as the parties saw, and to think as they must have thought in assenting to the stipulations by which they are bound. This process is always effective. When the terms employed are doubtful or obscure, there is no surer guide to their intent and meaning. * * * If a contract be unreasonable and unconscionable, but not void for fraud, a court of law will give, to the party who sues for its breach, damages, not according to its letter, but only such as he is equitably entitled to."

In Hume v. U. S., the court of claims, having under consideration an agreement to pay $1,200 a ton for shucks actually worth not more than $35 a ton, after citing some of the cases above quoted, said:

"These citations are sufficient to show that in suits upon unconscionable agreements the courts of law will take the matter in their own control, and will, without the intervention of courts of equity, protect the parties against their enforcement. * * * There is no finding by the court of actual fraud by any of the persons engaged in making the contract now under consideration. The unconscionable price inserted for shucks was, no doubt, a mere accident. * * * But, however it may have happened, we hold, as was held in the case of Leland v. Stone, from which we have quoted the words of the court, that a contract may be held unconscionable without proof of actual fraud at its inception, if its enforcement would be unconscionable."

Judgment was accordingly rendered in favor of the claimant for the actual value of the shucks. This judgment was affirmed by the supreme court.

Whatever conclusion might have been arrived at as to the bonus if the syndicate had fully completed its contract, and produced the 125 tons of contained nickel in matte, it seems clear to my mind that

upon the facts it is only entitled to a judgment for the amount of money actually advanced, to wit, $28,504, with interest and costs.

Defendant Smith obtained a judgment against the syndicate on April 22, 1897, for the sum of $263 principal, and $13.15 costs, which has never been paid. The interests of the other defendants are subsequent to the rights of the syndicate. Let a decree be entered in accordance with the views herein expressed.