# UNIVERSITY OF TENNESSEE v. MEMPHIS HOSPITAL COLLEGE BUILDING COMPANY.

Western Section.   August 5, 1927.

Petition for Certiorari denied by Supreme Court, December 17, 1927.

1. **Corporations.**   **Estopped.**   **Where officers of a corporation know and authorize an act it is estopped to deny it regardless of the absence of minute entries.**

   In an action to enforce an option for the purchase of a building in a lease where the defendant endeavored to exclude all testimony showing that the defendant company knew and authorized the lease because there were no minute entries to that effect on the books of the corporation, held that the corporation had actual knowledge and it was therefore estopped to deny the fact.

2. **Corporations.**   **Instrument signed by the proper officers of a corporation and having the corporate seal attached is prima facie evidence that it is the act of the corporation.**

   Where an instrument is introduced and signed by the proper officers of a corporation and bearing the corporate seal it constitutes prima facie evidence that the instrument was properly executed by the corporation and

the burden is on the party denying the instrument to show lack of authority for the execution of it.

3. **Corporations. The fact that the minute books of a corporation do not show that officers have authority to do an act does not disprove that they had authority.**

The fact that the minute books do not show authority in the officers of a corporation to do a certain act does not prevent the offering of proof to show that they in fact did have authority to act.

4. **Corporations. Contracts. The recital in the contract that the officers of the corporation had the authority to make it is prima facie evidence of the fact.**

The recital of authority in a lease that the officers had authority to make it itself is sufficient without the production of a minute entry.

5. **Corporations. Evidence. There is a presumption that the necessary steps were taken to execute the contract.**

In the aid of justice where a corporation vote is strictly necessary to the validity of a contract, such a vote will be presumed.

6. **Corporations. Act of 1907 (Chapter 437 Shannon's Code, section 2046A1-2046A4) does not apply to the sale of a part of the corporation's property.**

The above sections of the statute apply only when a corporation is selling all of its property and its franchises, and do not apply to the sale of a part of its property.

7. **Contracts. Specific performance. Specific performance will not be denied simply because property has increased in value.**

In an action to enforce an option of sale in a lease where it was urged by the defendant that the property had greatly increased in value and it would be inequitable to specifically enforce the option, held that the parties were getting all that they had originally bargained for and the fact that the property had increased in value did not constitute any cause for refusing to specifically enforce the option.

Appeal from Chancery Court, Shelby County; Hon. D. W. De-Haven, Chancellor.

Affirmed.

W. P. Metcalf and T. K. Riddick, of Memphis, for appellant.

Robert S. Keebler and Ewing, King & King, of Memphis, for appellee.

HEISKELL, J. This is a bill filed on June 23, 1925, by the University of Tennessee, seeking the specific performance of a contract entered into by the University with the Memphis Hospital Medical College Building Company, under date of June 1, 1913, whereby the University leased for twenty years a lot and building on Union avenue, in the City of Memphis, Tennessee, known as Rogers Hall. The lease contract contains a clause giving the University the right to purchase the property for a certain sum, at any time during the term of the lease. Before this bill was filed the University tendered the amount stipulated and the tender was refused by the defendant company. The Bank of Commerce & Trust Company was made defendant also by reason of being trustee, under a deed of trust to se-

cure a bond issue on said property, but the Building Company will be treated as the sole defendant.

The defendant Building Company filed an answer denying that the purported lease contract was validly executed, maintaining that same was not authorized by the stockholders or directors of the Building Company, who had no knowledge thereof, and that the Building Company is bound neither by authorization nor estoppel. The answer further contends that the Building Company repudiated any obligation under the lease contract in the year 1920, and that the University is guilty of laches for not having sooner filed this suit; also that the leased premises have now enhanced five times the amount stipulated in the option clause of the lease contract, and that the enforcement of the contract would be unconscionable and unjust. In addition to its answer, the Building Company filed a cross-bill expressly repudiating any obligation under the lease contract and praying the court to award it a judgment for rent against the University on the basis of $12,000 per year. The court below found for the complainant in all respects and entered a decree for the specific performance of the contract, from which the Building Company has appealed.

The Chancellor's finding of facts gives a full and detailed history of the events leading up to the alleged lease and option upon which this suit is based and the circumstances surrounding the execution thereof. At the same time the findings decide the issues of fact in dispute between the parties. Many of the facts set out are not controverted. The findings are satisfactory to the complainant. The defendant has in its assignments of error addressed many objections to the findings of the Chancellor, but even then the history of the controversy as given in the findings is for the most part admitted by both parties. We can, therefore, see no better way to present this case for discussion than to set out the Chancellor's findings and then take up the assignments. The findings will be given in full. They are as follows:

"(1) The Memphis Hospital Medical College was a proprietary medical school in the City of Memphis. By 'proprietary' is meant a school or college owned by the members of the faculty. In the year 1901 the faculty of the College conceived the idea of erecting a new school building and proceeded to incorporate a Building Company, under the laws of the State of Tennessee. The organization meeting of the corporation, named 'Memphis Hospital College Building Company' was held on January 19, 1901. At this same meeting the board of directors authorized the purchase of the lot on Union avenue near Marshall avenue, here in controversy, at the price of $9,900. All of the stock in the corporation was owned by the faculty of the College. The board of directors of the Building Company, and the

stockholders, authorized and provided for the issuance of $60,000 of bonds of the company, and the execution of a trust deed on said property to secure the payment of the bonds. The capital stock of the Building Company was $40,000. This, with the proceeds of the issue, gave total resource of $100,000 with which to pay for the lot and erect the schoolhouse. This improvement cost $82,046. On the completion of the building it was, on March 15, 1902, leased to the Memphis Hospital Medical College for a period of fifty years, at an annual rental of $10,000. At first all of the stock in the Building Company was owned by the members of the faculty of the college, later, some of this stock passed into outside hands.

''(2)    About the year 1910, the exact time not appearing in the record, the educational council of the American Medical Association erected certain standards and according to these standards classified colleges as 'A,' 'B,' 'C.' It was instantly recognized that no college except class 'A' could continue to exist. Among the specifications laid down by the educational council was that a certain number of teachers should be employed who would devote their entire time to teaching. This would necessitate the payment of relatively large salaries, which no proprietary school, such as the Memphis Hospital Medical College, could afford to pay out of the income derived from fees obtained from students. It was plain that no medical college could continue without an endowment or State aid. The proprietary school was a vanishing type in 1912 and 1913. Even prior to this classification of medical colleges by the American Medical Association, the number of students attending the Memphis Hospital Medical College had steadily declined. The requirement that students be graduates of high school lessened the attendance. Then came a rival school, called the College of Physicians and Surgeons in Memphis, and the field was too small for two medical schools. Things looked dark and gloomy for the Memphis Hospital Medical College in 1912, and for some time prior thereto. On May 22, 1911, the Building Company reduced the annual rental of the school building to $8,000.

''The University of Tennessee had maintained a medical school at Nashville, and it had proven a failure. The trustees of the University thought of moving its medical department to Knoxville, but, on reflection thought it well to locate in Memphis. So it was that in the year 1911 the University purchased and took over the College of Physicians and Surgeons, at Memphis. This added to the desperate strait in which the Memphis Hospital Medical College found itself. In this situation negotiations were opened by the College looking to the amalgamation of the College with the University of Tennessee. During the summer of 1912, Dr. Brown Ayres made a specific offer of amalgamation. This offer did not meet with

the approval of the faculty of the Memphis Hospital Medical College and was declined. Dr. W. B. Rogers, a leading physician in the City of Memphis, was the leading spirit in the College and was president of the Building Company. He was ill and could not undertake to do anything personally looking towards renewed negotiations with the University. Dr. B. F. Turner, a member of the faculty of the College, and a stockholder in the Building Company, went to Dr. Rogers and asked him if nothing further could be done. Dr. Rogers was willing for Dr. Turner to make a try, and shortly thereafter Dr. Turner got in touch with Dr. Brown Ayres and met him in Jackson, Tennessee, and there obtained Dr. Ayres' consent to meet Dr. Rogers for a further conference looking towards amalgamation. Dr. Ayres and Dr. Rogers had a conference and the result of it was the drafting of a tentative agreement looking to the merger of the College with the University.                           /

"Dr. B. F. Turner went to Knoxville, Tennessee, on January 10, 1913, took the tentative agreement between Dr. Ayres and Dr. Rogers with him, and discussed the proposed amalgamation with the board of trustees of the University. This conference resulted in complete agreement as to the terms of the amalgamation. Two contracts were prepared by the trustees of the University, one a contract of merger with the Memphis Hospital Medical College, and the other a lease of the school building, with option to purchase, with the Building Company.

"Dr. B. F. Turner was duly authorized to represent the directors and faculty of the College in the negotiation on January 10, 1913. Of this there can be no doubt, because the contract or agreement of merger, formally executed by the College on April 3, 1913, recites that the memorandum of agreement adopted by the trustees of the University:

" ' . . . at a called meeting of said board of trustees, called for the purpose of considering the proposition to absorb the Memphis Hospital Medical College, and held at Knoxville on January 10, 1913, and agreed to by B. F. Turner, duly elected to represent the directors and faculty of the Memphis Hospital Medical College, and authorized to negotiate and close with the board of trustees of the University, which memorandum of agreement is hereto attached,' etc.

"This contract of merger was executed by the College corporation at a time when a majority of the stock in the Building Company was owned by members of its faculty and Dr. W. B. Rogers, the secretary of the College corporation, was president of the Building Company.

" (3)    There is no record in the minutes of the Building Company that Dr. Turner was authorized to represent it at the conference in Knoxville, on January 10, 1913.

"The lease contract between the University and the Building Company is dated June 1, 1913, and was executed in duplicate by W. B. Rogers, president, and C. H. Bright, secretary, on behalf of the Building Company, and by Brown Ayres, president, and Wm. Rule, secretary, on behalf of the University. The seal of the Memphis Hospital Medical College Building Company is impressed on the contract held by the University, and, likewise the seal of the University. The duplicate copy held by the Building Company has impressed the seal of the College instead of its own seal. This lease contract is found bradded in the Minute Book of the Building Company, on page 142, opposite the minutes of a board meeting held in 1915. Mr. C. H. Bright was secretary of the Building Company at the time of the execution of this lease and for a number of years thereafter, including the year 1915. No minute entry of the board of directors of the Building Company, or of its stockholders, refers to the execution of this lease, or to the execution of any other lease to the University.

"This lease while dated June 1, 1913, was probably executed soon after the College asked for the cancellation of its lease from the Building Company, on April 2, 1913. The reason for the later date of the lease was that under the merger agreement the University was not to take over the College until after the expiration of the school term on May 7, 1913.

"(4) On January 7, 1913, the board of directors of the Building Company passed the following resolution:

"'Resolved, that the officers of the Memphis Hospital Medical College Building Company be and are hereby authorized to cancel the present lease of this company held with the Memphis Hospital Medical College, at the request of the said Memphis Hospital Medical College, and to enter into a lease with the University of Tennessee, through its board of trustees, for a period of ten years, at a rental equal to the interest of six per cent on the outstanding bonds of the Memphis Hospital Medical College Building Company, plus $2000 annually for the retirement of two bonds of $1000 each, as per the original contract of this company to do this; plus six per cent net on the $40,000 capital stock of the company. The University to have the option of surrendering this lease after having paid five full years rent as specified above, upon the payment of one year's rent on the same basis as the previous years, or fifth year.'

"This resolution was passed prior to Dr. Turner's visit to Knoxville, on January 10, 1913, and prior to any formal request by the College for the cancellation of its lease. The request for cancellation was not made until April 2, 1913; being authorized by the board of directors of the College at the same meeting it ratified the

amalgamation contract with the University.  The lease was marked across its face, in the Minute Book of the board of directors of the College, as cancelled and the cancellation is signed by W. B. Rogers, president of the Building Company, and C. H. Bright, its secretary, under date of April 3, 1913.

"The Minute Book of the Building Company contains no record of any lease to the University executed in accordance with the terms of the resolution of January 7, 1913.  There is an utter absence of minute record of any lease having been executed to the University.  The only record shown is the lease here in controversy, bradded in the Minute Book.  The minutes of the board of directors of the College, of April 2, 1913, show a copy of the resolution of the Building Company of January 7, 1913.

"(5)  At the time of the amalgamation of the College with the University, a majority of the capital stock of the Building Company was owned by the members of the faculty of the College.  The members of the faculty owning stock in the Building Company understood and had knowledge of the fact that the lease from the Building Company to the University was for a period of twenty years, with an option to purchase on the terms set forth.

"(6)  The directors of the Building Company, as shown by minutes of February 4, 1913, were as follows:  E. M. Holder, J. L. Minor, B. G. Henning, Max Henning, W. B. Rogers, president, F. D. Smythe, J. E. Winn, B. F. Turner, C. H. Bright, absent member being A. G. Sinclair.

"Of these ten directors the record shows that the following eight had actual knowledge as to the option contained in the lease, to-wit:  J. L. Minor (forty shares); F. D. Smythe (fifteen shares); C. H. Bright (three shares); B. F. Turner (forty shares); B. G. Henning (fifty shares); A. G. Sinclair (thirty shares); W. B. Rogers (fifty shares and fifteen shares acquired from estate of Dr. Alexander Erskine).  These eight directors owned a total of 243 shares of the 400 shares constituting the capital stock of the Building Company.  I find that Dr. Max Henning also knew of the option to the University.  He says 'that was the impression all over the school.'

"(7)  The taking over of the Memphis Hospital Medical College by the University of Tennessee was a matter of great public interest.  The Memphis Chamber of Commerce had a committee working for an amalgamation.  Mr. C. P. J. Mooney was a member of that committee.  Later, he was appointed by the Governor a trustee of the University.  It was a matter of general and public knowledge that the University 'had an option to buy.'  Mr. Mooney knew about the option and he was neither a director or stockholder in the Building Company, or a member of the College or a trustee of the University.  The newspapers were interested in the merger of consolida-

tion. The physicians of Memphis were interested. Rowan A. Greer, a trustee of the University, was active in the matter. The matter of the option to purchase was one of the essential elements of the consolidation. Greer discussed the matter with Drs. Henning, Rogers, Turner, Smythe, Minor and Holder. It was distinctly understood in these conferences that the University would not take over the property upon any other terms than such that would give the University the right to purchase the property. Dr. E. E. Francis, a member of the faculty of the College, knew about the right of purchase. It was discussed at a meeting of the faculty of the College.

"(8) Under the option clause of the contract, the consideration to be paid for the property by the University was 'an amount equal to its (Building Company's) capital stock of $40,000, plus the face value of the said first mortgage bonds that may still be outstanding and unpaid at the time the said University of Tennessee shall give notice to the said Memphis Hospital Medical College Building Company of its intention to avail itself of this option and purchase said property.' This option to be exercised at any time before May 31, 1933. The amount of outstanding bonds of the Building Company, at the time of the execution of said lease, was $36,000. Thus, the Building Company was really selling its property, in the event the option was exercised, for $76,000. Had the option been at once exercised that is the amount the University would be compelled to pay for the property. By deferring the exercise of the option, the University paid no less sum. This is true, because under the contract, the University was compelled to pay $2000 per year to take care of two maturing $1000 mortgage bonds. It also paid interest on these bonds and six per cent on the $40,000, equalling in amount the capital stock of the Building Company. It had to keep the building insured in the sum of $70,000. Many of the interested parties considered the contract as equivalent to the purchase of the property by the University. It is true that the University could cancel the lease after five years, but if it did so, it was to pay a penalty of one extra year's rent.

"The consideration to be paid by the University for said property was entirely reasonable. Mr. E. B. LeMaster, an expert on real estate values in the City of Memphis, and with years of experience, values said property, as of 1913, as follows: Lot $24,000; building $50,000; total $74,000. Mr. L. A. Montedonico, a real estate expert, places the value of the lot, in 1913, at $24,000; building $46,000; total $70,000. Chas. J. Haase, real estate expert, values lot at $16,500. He says 'building not adapted for general commercial purposes and would be difficult of conversion to ordinary commercial use.' Says he would have regarded $76,000 as 'a very good price' in 1913. The building was erected in 1901, and was specially

designed for a medical school. It had very large halls, high ceilings, the main floor about twenty-three or twenty-five feet high, and there was a vast waste of open space in the building. The building is of substantial construction, concrete and steel, and ought to stand up for seventy-five years. It stands about seveny-five feet back from the street. This building was, in 1913 and now, practically unfitted for any other business. This lease and option contract was highly beneficial to the Building Company.

"Defendant has offered proof of the cost of duplicating this building, Rogers Hall, today. I don't think this is in any way material to the case. Furthermore, no one would want to duplicate it. The record shows that to erect a building like this today would cost about double the original cost. The original cost was $82,046, according to the sworn income tax reports of defendant. The present value of the lot is about $50,000. The building could be converted into a storage house or adapted to some manufacturing business.

" (9) The University, upon execution of lease with option to purchase, took possession of said premises and has carried out all the terms of the lease. The Building Company accepted from the University all payments called for in the lease contract. The Dental Department of the University is housed in said building.

" (10) No question was raised by defendant as to the validity of the lease until 1920. For seven years the University occupied the building and defendant received the payments called for in the lease without any protest or objection being made. All this while the executed lease was reposing in the Minute Book of defendant's board of directors, which was also the Minute Book of its stockholders. All this while a majority of said board and a majority of the stockholders had actual knowledge of the contract and of its provisions.

"The following was the sequence of events in 1920. It appears that early in the year 1920 Dr. Turner appeared before the board of trustees of the University, held at Memphis, and asked that the University exercise its option and take over the property. The reason for this request was that Dr. Turner, who at that time was president of the Building Company, was anxious to see the Building Company relieved from paying taxes. The University was without funds with which to pay for the property, and the suggestion was that it give its notes for the $40,000, which was to be paid the Building Company. On January 29, 1920, Mr. Bolton Smith, who was now a trustee of the University, wrote Dr. Turner as follows:

" 'In view of the action of the trustees in giving the Memphis trustees authority to go ahead and close the purchase of Rogers Hall, I can see no reason for delay. Will you please see that copies of the contract and calculations are laid before us so that we can take the proper steps. Have you an abstract of title?'

"On March 12, 1920, the following appears from the minutes of the board of directors of the Building Company:

" 'At this meeting and at this juncture the matter of the present lease and purchase option by the University of Tennessee of the building owned by the corporation came under general discussion, resulting in the following motion: Moved by F. D. Smythe and seconded by C. H. Bright that the chair appoint a committee of two as to the statuts of the lease and contract as now existing between the Memphis Hospital Medical College Building Company and the University of Tennessee.'

" 'The next meeting of the board was on April 24, 1920, and the following appears:

" 'The chair stated: "The purpose of the meeting was to hear the opinion of Mr. W. P. Metcalf, Attorney, who was present at this meeting upon inivitation, concerning the lease and option of the Building Company to the University of Tennessee. Thereupon Mr. Metcalf gave in detail his opinion as to the legal status of said lease and option. The meeting was given over entirely to discussion of the matter of the lease and no further business transacted. Upon the termination of the general discussion and full information from Attorney Metcalf concerning the lease and option, chair adjourned meeting." '

"On May 3, 1920, Dr. Turner, president, directed secretary to call meeting of board 'for purpose of discussing the opinion recently rendered by Mr. Wm. Metcalf regarding the contract which exists between the Building Company and the University of Tennessee.'

"The board met on May 10, 1920, and 'further action in regard to the lease and option held by the University of Tennessee being deferred until next meeting.'

"The next meeting of the board was on May 14, 1920, and the following appears:

" 'At this meeting general discussion of the situation *in re* lease and option to the University of Tennessee was entered into. Mr. Metcalf, Attorney, reading his opinion again for the general information of the board. The president read a suggested letter composed by him to the trustees of the University. This letter did not according to the sense of the meeting cover in full the matter and manner of communication which should be made to the University.' Thereupon, on motion, Dr. Turner and Wm. Metcalf was appointed a committee to decide 'mutually between themselves' upon the communication to be forwarded to the trustees of the University.

"On May 17, 1920, Dr. Turner replied to Bolton Smith's letter of January 29, 1920, as follows:

" 'The board of directors has been reliably advised that the contract existing between the Building Company and the University of Tennessee is open to construction inimical alike to the University and of the stockholders of the Building Company, and the board of directors considers it their duty to so inform you. The books of record of the proceedings of the stockholders and of the board of directors of the Building Company are in the custody of the secretary, Mr. C. H. Bright, Room 403 Central Bank Building, and are available for the inspection of the trustees of the University at any time.'

"Mr. Smith transmitted a copy of this letter to the president of the University.

"On May 19, 1920, Thos. D. Morris, secretary of the board of trustees of the University, wrote Dr. Turner:

" 'President Morgan has asked me to inquire as to whether the owners of the Memphis Hospital College Building had taken under further advisement the question about which you addressed the University board at the meeting in January last, and if so, whether the Building Company would consider the vesting of the title to the property in the University now, under the general plan indicated by the board at that meeting. The board may hold a special meeting at an early date, at which time the president could bring before it any further communication from the Building Company, if necessary. Thanking you in advance for an early reply, I am,' etc.

"On May 24, 1920, the following reply was made to the above letter. The letter is signed by Dr. Turner, but was not written by him. The minutes show that it was moved that the secretary confer with Mr. Metcalf and reply to letter 'sending the letter to Dr. B. F. Turner for his signature.'

" 'Your letter of May 19th was duly received and evidently crossed my letter of May 13th on the subject of the property of the Memphis Hospital College Building Company. In view of the fact that there have been held a number of directors' meeting at which the status of the instrument executed by Dr. Rogers has been discussed and following which the board of trustees of the University have likewise employed counsel in the matter, I would suggest that the respective attorneys themselves confer, following which the board of directors of this company hold a meeting at which a resolution will be passed reflecting the sentiment of the board and the stockholders in the matter.'

"No resolution of the board of the character indicated above was ever passed. From this point any question about the lease fades out of the minutes, until the year 1925. No notice from the Building

Company was received by the University as to the position assumed by that company on the question of the validity of the lease. Mr. Keebler, attorney for the University, in a letter from him to the University undertakes to set forth some of the contentions made by Mr. Williams P. Metcalf, representing the Building Company. Mr. Keebler and Mr. Metcalf, of course, learned, each, the position and contention of the other and must have passed this information on to their respective clients., The resolution, however, of the board of directors of the Building Company definitely stated that following the conference of the attorneys 'a resolution will be passed reflecting the sentiments of the board and the stockholders in the matter.' This was never done (until June 29, 1925) and the board of trustees of the University never learned the sentiments of those composing the Building Company until after tender made.

"The board of directors of the Building Company met on March 14, 1921, March 25, 1922, March 10, 1923, March 21, 1924, March 19, 1925, without mentioning the lease contract, except to the extent that financial statement would show received so much 'as per lease' from the University.

"On May 29, 1925, complainant notified the defendant in writing that it exercised its option to purchase said property, and on the same day tendered to said Building Company, through its proper officer, the full sum of $52,360 in legal currency of the United States, being the correct amount due under said option clause, to-wit:

"Amount equal to capital stock of Building Company .................................... $40,000
"Principal amount of bonds outstanding .......... 12,000
"Interest accrued on outstanding bonds ........... 360 .
                                                   ─────────
                                                   "$52,360

"At the time of making said tender the complainant demanded that the defendant execute a conveyance of said land to it in accordance with the provisions of said contract.

"Said tender was refused by the defendant and it refused to execute the conveyance, as requested, and then and there repudiated any and all obligations under the lease contract and notified complainant 'that a new year to year lease must be entered into or your continued occupancy of the Building Company's property be on a rental basis of six per cent net to the stockholders, calculated on the appraised value of the property which is estimated to be worth $200,000.'

"The bill herein was filed on June 23, 1925. By agreement, complainant was relieved of the necessity of paying the amount of the tender into the registry of the court.

"(11) At the meeting of the board of directors of the defendant company on May 14, 1920, at which there was a general discus-

sion of the situation in re lease and option to the University of Tennessee was entered into, Mr. Metcalf again reading his opinion for the general information of the board, 'it appears that the matter of insurance was discussed and it was moved and carried that—

" '. . . the secretary of this board be and is hereby instructed to take the matter up with the University of Tennessee and explain that under the present valuation of the property the policies delivered to the Building Company carrying the seventy per cent co-insurance clause were not satisfactory and did not meet the lease obligation as provided.'

"The lease referred to was the lease here in controversy.

"(12)   The University did not, in 1920, abandon its purpose to exercise its option to purchase Rogers Hall, nor did it in any way admit or concede that the lease contract was invalid. In 1920 the University did not have the money with which to make the purchase. Dr. Turner's suggestion was that the University give its notes to cover the $40,000 going to the Building Company. Dr. Turner was president of the Building Company and desired that the University take over the property and thereby save the payment of taxes. The University consented to give its notes and take the property. Then came the agitation in the board of directors over the question of the validity of the lease contract. The University could not go ahead and insist on a deed, at that time, because it had no money and could not compel the Building Company to accept notes. As soon as money was available, in 1925, it made the tender and demanded a deed.

"(13)   The University has adopted a plan of development for its three departments in the City of Memphis, and to that end has acquired some nine or ten lots adjacent to the Baptist Hospital and the building purchased from the College of Physicians & Surgeons. The Legislature in 1925 made a sufficient appropriation to pay for these lots and erect one of the buildings called for by the plan. Now Rogers Hall is conveniently located with respect to the property of the University. It is a little over three average city blocks away. The distance is no greater than, as one witness expressed it, that which separates some of the University buildings at Knoxville. Just how many years it will take to develop the whole plan of the University and erect all of the contemplated buildings is a matter of surmise and not shown in the record. In the meantime, it will need 'Rogers Hall.' I find no warrant for the argument that the University is seeking to acquire this property merely as a real estate speculation. Mr. Mooney in a statement he made before a legislative committee, spoke of the possibility of selling Rogers Hall and with the proceeds build a third building on the new property. Mr. Mooney, however, considered that the University acquired Rogers Hall in 1913.''

The first assignment of error is that the decree was erroneous. Of course this was not meant by counsel for discussion.

The second assignment challenged the competency of over 250 questions and answers in the testimony of various witnesses. It is impossible to follow these objections in detail. This testimony can be treated only in general terms.

Complainant presents its twenty-year lease and option regularly executed under the seal of the corporation. It is admitted that the University entered into possession of the property in question upon the execution of said lease in 1913 and has remained in possession ever since, claiming under said instrument, or if not admitted, this is established beyond controversy. But the defendant says this twenty-year lease is void because executed without authority, as there was no such authority on our minute book and our stockholders had no notice of this transaction. The testimony, objected to, is offered to show that the then stockholders of the Building Company in 1913 did know all about the transaction, as it was consummated in the shape of the twenty-year lease with option. The purpose of the proof is to show the circumstances surrounding the parties to this transaction at the time it was entered into, and what knowledge in regard thereto was in the mind of the parties at the time.

The defendant pleads the absence of minute entries and objected to any testimony that would supply the place of minute entries or lay the foundation for presumptions to take the place of records. Knowledge works estoppel. Knowledge can be brought home to a corporation only through its officers or stockholders. The testimony objected to was intended to fix this knowledge. The only witnesses who know anything about what took place and what existed in 1913 support the contention of the University. The testimony of the others is merely negative. Even if some of this testimony is incompetent, in its main features it is entirely competent and there is enough of this to establish the estoppel contended for by the complainant.

The third assignment takes up and objects to various findings of fact of the Chancellor.

(a) That the building cost $95,359.88 instead of $82,046. Page 40 of the Minute Book of the Building Company is cited to support this contention. This is a report showing total receipts and expenditures from the organization down to January 23, 1903. Total receipts $110,752.43, but of this, $5415.90 remained, leaving total debits $105.336.53. Deducting cost of land $9900 leaves $95,466.53. But $3600 was paid for interest on bonds and $511.81 for insurance. It at least does not appear that this $4111.80 should be charged, especially as $10,000 went into the total of $110,752.43. So we have $91,354.73 and adding to the Chancellor's figures $82,046 the cost

of the lot $9900, we have $91,946.   We do not claim that these figures are accurate, but at least the record cited to show error against the defendant in the Chancellor's figures does not sustain the assignment.   The Chancellor takes the amount he adopts from the income tax report of the corporation, and the only pertinence is to show that the property in 1913 sold for approximately its value.

(b)   This refers to the finding in regard to a letter of Dr. Brown Ayres, president of the University.   What Dr. Ayres had in mind tentatively in January, 1912, can have little or no weight in regard to the contract executed more than a year later.

(c)   This objects to the finding that two contracts were prepared on the occasion of Dr. Turner's visit to Knoxville in January, 1913. What Dr. Turner meant, and what the Chancellor meant, no doubt was that these were tentative papers, not intended to be then executed, but in the nature of a proctocal, and there is no conflict with this and the contention that the real contract, as executed, was drafted later.

(d)·   The only objection here is that the Chancellor found that the lease was bradded in the Minute Book of the Building Company opposite the minutes of a board meeting in 1915, when that meeting adjourned over for want of a quorum.   This is not material.   The lease was fixed in the Minute Book.   This is not denied.

(e)   This claims error in the finding of the Chancellor that the lease between the Building Company and the College was cancelled except to make a ten-year lease with the University, according to the resolution of January 7th.   This is not material. · The old lease might have been cancelled with the intention to make a ten-year lease; yet that would not prevent the making of twenty-year lease some months later.

(f)   This challenged the finding that eight of the directors had knowledge of the option, when he set down only seven.   The Chancellor said eight, then enumerated seven, and then said Max Henning also had knowledge.   The only difference is that Max Henning should be counted as one of the eight.

(g)   Objects to the Chancellor's finding that it was a matter of general and public knowledge that the University had an option to buy, general and public does not mean universal.   The witnesses best qualified to testify on the subject said the matter was much discussed and the facts of the option was generally known.   Knowledge general so far as College and Building Company circles went was sufficient.   The only material fact is, was the knowledge common to those groups?   If so, it strengthens the presumption that all stockholders of the Building Company knew about the option.

(h)   That it was error to find that the option was one of the elements of consolidation.   This is mere argument, without citation of anything to show that the Chancellor was wrong, or even just what he

found. There is proof to support the finding that the University was not willing to take over the College without the option on the building.

(i) Finds fault with the Chancellor saying that because the lease was bradded in the Minute Book, therefore a majority of the board and stockholders had actual knowledge. This is argument without citation of proof or law. The Chancellor cites authorities to support the presumption he indulges.

(j) Says the Chancellor was in error in finding that no notice was received from the Building Company by the University on the question of the invalidity of the lease when Mr. Keebler had presented the contention of the Building Company to his client, the University. The Chancellor set out the whole situation, how the matter was discussed in meeting and by the lawyers, but the Building Company took no official action, passed no resolution, repudiating the lease, but went on accepting the rent.

The other assignments, except 12, cannot well be treated separately. Some of them taken by themselves do not correctly represent the findings or holdings of the Chancellor. In the aggregate they attack the findings of fact and the rulings of law upon which the decree of the lower court is based, and can best be treated by considering the decree as a whole. Assignment 12 relates to the act of 1907. This assignment admits of separate and distinct treatment and will be so discussed. The other assignments will be, without further reference to them covered by the discussion of certain propositions of law and fact, at least so far as these are considered material.

As has been stated this suit is based upon a lease for twenty years, with option to purchase during that time. This instrument was regular on its face, being executed by the president and secretary of the Building Company, under the seal of the corporation, and reciting authority of the Building Company. It was executed by the proper officers, according to the by-laws of the corporation.

It is admitted by counsel for the defendants that the fact that the lease and option is signed by the corporation by its proper officers and that the corporate seal is attached thereto, is prima facie evidence that it is the act of the corporation. It is also admitted that the burden of proof is on the party asserting it, to show lack of authority. In other words, counsel admit the rule laid down in 14 Corpus Juris, sec. 2250. Levering v. Memphis, 7 Hum., 553, and Memphis v. Adams, 9 Heisk., 518. But counsel for defendant insist that they have triumphantly carried this burden and overcome this prima-facie case. The only evidence to overthrow the executed lease reciting authority and with seal attached, is the absence of authority appearing on the minutes to make a twenty-year lease with option,

and the resolution of January 7, 1913, which does appear on the minutes authorizing a ten year lease. This evidence does not overcome the twenty-year lease and option. The absence of authority on the minutes does not disprove authority. It is merely negative and proves nothing. The resolution authorizing a ten-year lease is not much stronger because it does not preclude the idea of authority given later to execute the only lease that was executed. No witness who knew anything whatever about the meetings of the Building Company testifies that no authority was given, while the witnesses for complainant, the only witnesses who know anything about the transaction itself and the knowledge, intents and purposes of the parties to the transaction strongly indicate that such authoriy as recited in the executed lease was actually given. The prima facie case made by the executed, sealed instrument is supported by more affirmative proof than is arrayed on the other side to overthrow it. In other words, the whole proof adds to rather than substracts from the prima-facie case. If the Building Company authorized the twenty-year lease and option, the rights of the complainant cannot be prejudiced by the failure of the building corporation to record the authority on its minutes. Smiley v. Mayor, etc., 6 Heisk., 604. .

The recital of authority in the lease itself is sufficient without the production of a minute entry. Turner v. Lumber Co., 106 Tenn., 1

Besides "in the aid of justice where a corporate vote is strictly necessary to the validity of the contract such a vote will be presumed." 10 Cyc., 1035.

Counsel for the Building Company argue that the University had knowledge of the resolution of January 7, 1913, on the minutes of the Building Company, providing for a ten-year lease. That this resolution was reiterated and readopted on February 4, 1913, as the only terms upon which the company would contract with the University. In the first place the action of the meeting of February 4th was merely the adoption of the minutes of the previous meeting, after correction. However, assuming full knowledge of all this on the part of the University, assuming that Dr. Rogers himself said to the University on January 7th and February 4th, "this is the best we will do" and then the twenty-year lease appears bearing date June 1st, what effect has the knowledge of the resolution on the executed contract. Suppose a resolution appeared in the minutes of the University in January, authorizing a lease for thirty years, at a lower rental than provided for in the paper executed of date June 1st, and this had come to the knowledge of the Building Company, could the University claim to be thereby released from the twenty-year lease executed by its president? Knowledge of such a resolution can have no greater weight than knowledge of a proposition submitted and rejected.

In this connection the testimony of Dr. Turner and of Rowan Greer, taken together, offer an explanation of the twenty-year lease. Dr. Turner says a memorandum of the whole scheme was drawn, which he did not have authority to execute, but which it was understood the College and the Building Company would stand by, and he spent a whole day at Knoxville in discussion. Greer says at some point in the negotiation between the University and the Building Company, there was a meeting of the trustees of the University and the proposition of the University was submitted to the representatives of the Building Company, who were present, and they said they would consult the Building Company. That the meeting of the University trustees waited until the representatives of the Building Company returned and reported that they were authorized to accept the offer of the University for a twenty-year lease with option to purchase. There were meetings of the trustees of the University held in Memphis. It is natural that one should have been so held in this connection and at this time. Greer's testimony is definite and circumstantial; it is reasonable, and it is uncontradicted. A meeting of the stockholders, at that time, could have been quickly assembled, and the authority voted, with the intention to put it on the minutes later, which was neglected. This would reconcile the testimony on this point and reconcile the testimony with the presumption arising from the recital of authority in the lease as actually executed by the proper officers of the Building Company.

It is a significant fact that all of the stockholders of the Building Company who ever attended a meeting of that company, who testify in this case, support the contentions of the complainant. These witnesses are Dr. Turner, Dr. Max Henning, Dr. E. S. Francis and Dr. J. L. Minor. It is true Dr. Smythe, Dr. Holder, Mr. Joel Wynne and Mr. Bright were all directors and attended meetings, but two of them, Dr. Smythe and Joel Wynne are dead. Mr. Bright was physically unable to testify and Dr. Holder was not called by either side. Presumably he could prove nothing worth while.

Dr. Francis says they were all tickled to death with the transaction entered into with the University. It is attempted to break the force of this by the argument that he referred to the merger of the College and not to the lease of the property. His testimony should be referred to both, and of him and the other witnesses it may be said they were members of the faculty of the College and at the same time stockholders of the Building Company. Leaving out of view all legal presumptions, is it possible to imagine a group of men of this sort, part of whom knew about the terms of the lease to the University, while the others remained in ignorance? Can we conceive that men who gained knowledge of this transaction as members of the faculty of the College would not possess that knowl-

edge as stockholders of the Building Company and would not impart it to the others, who had common interests, professional, social and financial.

The twelfth assignment of error is:

"The learned Chancellor committed material and most damaging error against the defendant by holding that the Act of 1907 (chapter 437 Shannon's Code, sections 2046a1, 2046a4) regulating the sales of certain corporations and requiring a two-thirds vote of the stockholders in order to make said sale, did not apply to private corporations and therefore did not apply to the defendant in this case, and that accordingly, the agreement to sell its properties could be made without securing the affirmative vote of two-thirds of the stockholders."

The contention under this assignment is that this statute require an express and affirmative showing of authority by a vote of two-thirds of the value of the stock in a meeting of the stockholders of the corporation, and that in the absence of this authority thus expressed and shown the conveyance is void and cannot be aided by any presumption.

While we think there is no error in the holding of the Chancellor in this regard, yet if this statute is applicable to private corporations, it would avail defendant nothing because it does not apply to a transaction like this where a corporation is merely dealing with a particular piece of real estate. The statute is as follows:

"All corporations now chartered or that may hereafter be chartered under or by virtue of the laws of the State of Tennessee, whether by special statute or the general law, when in the judgment of the board of directors it is for the interest of the company, shall have the power to sell, convey, and transfer the whole of their property and franchises to any person or corporation of this or any other State or territory of the United States engaged in carrying on or which may be authorized by its charter to carry on in this or any other State or territory of the United States the same general business as is authorized by the charter of the vendor corporations; and the board of directors may empower the officers of said corporation to make, execute, and in the name of the corporation deliver all such deeds and contracts to said purchaser as may be necessary to effect said sale.

"Before any such sale shall be consummated, it must be authorized by either a special or regular meeting of the stockholders of the selling corporation, at which meeting the resolutions in favor of such sale must receive the affirmative vote, either in person or by proxy, of the holders of two-thirds in value of outstanding capital stock of the company; and if such

resolutions are adopted at a special meeting, notice of such meeting and of the purpose of same must be given by publication once a week for four consecutive weeks in at least one newspaper published in each of the cities of Nashville, Memphis and Chattanooga.''

It will be noted that the power given is—

''. . . to sell, convey, and transfer the whole of their property and franchises to any person or corporation of this or any other State or territory of the United States engaged in carrying on or which may be authorized by its charters to carry on in this or any other State or territory of the United States the same general business as is authorized by the charter of the vendor corporations.''

The statute applies only where the property and franchises are sold. No franchise was involved in this case. It is not conceivable that the legislature meant to say that before any private corporation could sell its place of business in order to buy a better one, if a called meeting were necessary that notice of same and the purposes thereof must be given by publication once a week for four consecutive weeks in at least one newspaper published in each of the Cities of Nashville, Memphis and Chattanooga, and even then if counsel for defendant are right in their contention, the sale could be made only to some person or corporation engaged in carrying on the same general business. We cannot think it was intended to forbid a corporation to sell its business location to any one who will buy at any time, and if we are right in this the act has no application to a transaction such as is in question in the present case. If the University had refused to take over this property the Building Company would have been left without a chance to sell to a medical school. Yet we cannot imagine legal advice being given that it could not sell to any one who wanted it for any purpose.

Two other contentions of the defendant may be treated together. That it was error to hold that the failure of the Building Company to take any steps to vacate the twenty-year lease and option of which it was affected with knowledge both by presumption and from proof of knowledge of its stockholders worked a ratification, and that it was also error to refuse to hold that the complainant was guilty of laches in delaying to make a tender and bring suit to assert its right under the twenty-year lease and option after the objections on the part of the stockholders and directors of the Building Company shown during the year 1920. That this delay until 1925 was laches from which abandonment of all right under said lien and option would be conclusively presumed.

The situation was this: The Medical College in 1913 was riding to a fall. The faculty of the College owned most of the stock of the Building Company. The building was adapted only for school pur-

poses. The College could run no longer. No one could take it over but the University. The alternative was to amalgamate with the University or close the Medical College and try to use the building for same other purpose. The stockholders of the Building Company feared that this would bring upon them a foreclosure by the bondholders, with the result of the loss of their stock. No doubt an additional inducement was found in the pride which the men who were both stockholders in the Building Company and members of the faculty of the Medical College took in the College they had helped to build up. However, this may be, the University at the last insisted on a twenty-year lease, with option to buy the property. The lease was executed by the president, W. B. Rogers, the man who had done more than any one else to create both the Building Company and the College. A man than whom none stood higher, according to the proof. The instrument recited authority from the owner corporation, it was sealed and delivered. The University went into possession under it at time of delivery, and has conducted its dental department therein ever since. It paid the rent every year and this was received and distributed among the stockholders of the Building Company. A copy of the lease was placed in the Minute Book of the Building Company in 1915. It was the only lease on the property. The only instrument to account for the existence of a tenant. The directors of the Building Company are presumed to have known about the transaction. Besides the only witnesses who testify, who attended any of the meetings of the Building Company in 1913, say they knew all about it and that the others knew about it and that it was a matter of common knowledge. Then in 1920 there is discussion of this matter in the camp of the Building Company. An attorney is employed who writes an opinion and reads it to more than one meeting of the corporation, advising that the twenty-year lease is void. The University also employs attorneys who advise that the lease and option are valid. No action is taken by the board of complainant or defendant until 1925, when the University makes the tender. This is refused and then for the first time the defendant company says officially the lease is void and you are tenant from year to year at our price. The property in twelve years had increased in value. It can be used for other purposes. It is getting to that point in the life of city property where owners can afford to wreck costly buildings to construct other improvements better suited to the location.

Under this state of facts and circumstances which party is estopped? Certainly not the University. They are in possession under an instrument valid on its face. Unless void, the University had until 1933 to exercise its option. If the lease was void the burden was on the Building Company to show it. If void the defendant

does not need the question of laches. If valid there can be no laches in not exercising the option sooner. There is no pretext in the proof for the contention that the University waived or abandoned its rights under the lease and option. As to the defendant it matters not whether it be said that from the facts and circumstances set out authority to execute the twenty-year lease will be presumed, or that its ratification will be presumed, or that the Building Company will be estopped to deny its validity.

In 1913 it looked as if the saving of the property's value depended upon continuing it as a Class "A" Medical College and no other entity besides the University of Tennessee could do this. The University not only went into possession and paid rent, which was accepted by the Building Company, but made valuable improvements, at one time spending $12,000.

"A corporation may be estopped to question the validity of a lease entered into in its name without proper authority where, having full knowledge of the facts, it recognzies the lessee as its tenant and receives from the tenant the benefits of the lease. A corporation may be charged with knowledge having this effect in cases where the knowledge is possessed by its executive officers." 2 Thomp. Corp., secs. 2048, 1960, 1964, 7 R. C. L., secs. 666, 667.

See, also, Development Co. v. Newcomb, 111 N. E., 16; Nevada Nickel Syndicate v. Nat. Nickel Co., 96 Fed., 133; 41 C. C. A., 681; Smiley v. Mayor, 6 Heisk., 604; Stainback v. Junk Bros. Co., 98 Tenn., 206; 5 Thomp. Corp., sec. 5286; 2 Thomp. Corp., secs 1960, 2048.

Counsel for defendant say it was not up to the Building Company to do anything in 1920 or since. The University was in possession under a regularly executed contract. The burden was on the Building Company to prove it void. Suppose the University had done nothing except pay rent and comply with terms of the executed contract, until notified that it must pay more rent. Suppose it had then refused and tendered the amount conceded to be due. Or suppose after tender under option, the University had declined to bring this suit and rested on its executed contract and tender of compliance. Would it have been up to the defendant to do anything, and what could have been done except bring a suit to declare the twenty-year lease void and have it delivered up to be cancelled and to recover possession of the property. It seems to us it could better be said that complainant was not called on to do anything except for the fear of an innocent purchaser, and this does not help the defendant.

It is urged against the complainant that it is seeking to take advantage of this option and enforce a specific performance for specu-

lative purposes and not because the University needs the property. The proof shows that the University has needed the property and has used it ever since 1913 and still needs it. That it may be needed for a long time to come. It is true the University has acquired other property and has erected other buildings, but Rogers Hall is still needed and probably will be needed for many years, to accommodate its increasing member of medical students, and the location is convenient for this use. Nothing can be made out of this contention to show a want of equity in complainant's suit.

Counsel for defendant contend that there was no consideration for the option moving to the Building Company. Before this the Building Company had voluntarily reduced the rent of the College. The only consideration for this loss to the Building Company was to retain a tenant. After paying this price the tenant had been lost. Reduced to a Class "C" school, the Medical College was expiring. Its faculty would serve no longer. It could not run another term. The Building Company was anxious to secure a tenant. They thought it advantageous to keep a medical school in the building as a going concern. The Building Company could have refused to reduce the rent to the College and tried to rent to some one else. It could have refused to rent to the University and made the attempt to secure another tenant. Wise or otherwise, its idea was to secure a medical school for tenant. There was as much consideration, as much apparent advantage in meeting the terms of the University, even to the extent of an option to secure a tenant, as there had been before in reducing the rent $2000, to a tenant already bound by a long lease. In 1913, according to the then views of the Building Company, there was no tenant in sight but the University. The company thought it would be a disaster to have the building left vacant. It thought it would be advantageous to secure the University for a tenant and this could not be done without meeting the terms of the University, twenty years, with an option. If the Building Company thought the lease advantageous and accepted the benefits of it, with knowledge, the principle of estoppel applies even if it turned out in after years that the lease was not an advantageous one.

At the last it is said for the defendant that it is within the discretion of the court to decree a specific performance. That is true, but this discretion must be used with a view to justice and equity. This was not an inequitable contract at the time it was made. If equitable, then the increase in value of property since that time does not make it inequitable. Competent real estate men place the value of the property in 1913 at about $76,000, approximately the value which was recognized in this transaction. However it might appear from 1920 to the present time, in 1913 it seemed to be advantageous to the Building Company to make this deal with the

University, and it is shown by the proof that the University would not have taken over the College nor leased the property without the option to purchase. The defendant received and retained the benefits of what was thought to be a good bargain. A decree for specific performance gives the defendant company what its stockholders contemplated in 1913. If specific performance is denied, not only does the complainant lose the benefit of the contract entered into in good faith, but it is impossible to place the University in the position it occupied before the execution of the contract.

We think the discretion of the Chancellor in decreeing a specific performance in this case was properly exercised in favor of the party with which were all the equities of the case.

All assignments of error are overruled and the decree of the lower court is affirmed. Defendant and surety on appeal bond will pay the costs of the appeal.

Owen and Senter, JJ., concur.